**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | No. 15 CR 756-1 |
| v. | ) | |
| | ) | Hon. Virginia M. Kendall |
| SAMUEL NICHOLS, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION & ORDER**

Defendant Samuel Nichols was charged by Superseding Indictment with conspiring to engage in sex trafficking by force, threats of force, fraud, and coercion in violation of 18 U.S.C. § 1594(c) (Count 1) and six counts of sex trafficking force, threats of force, and coercion in violation of 18 U.S.C. §§ 1591(a) and (b)(1) (Counts 2–4, 6–8). (Dkt. 51). Following a two-week trial, a jury convicted Nichols of Counts 1, 2, 3, 4, 6, and 8; he was acquitted on Count 7. (Dkt. 267). Nichols has filed a Motion for Judgment of Acquittal Notwithstanding the Verdict, or Alternatively, Motion for New Trial. (Dkt. 279); *see also* (Dkt. 294). For the reasons explained below, Nichols's Motion is denied. The jury's verdict stands.

**BACKGROUND**

On December 29, 2015, the government filed a two-count Complaint against Nichols, who is also known by the nickname "Buck" and "Kash." (Dkt. 1). Nichols was taken into federal custody in Tennessee (where he was being held on unrelated state charges) on January 5, 2016 and transferred to Illinois. (Dkts. 7, 40). On February 3, 2016, the grand jury returned a four-count Indictment (Dkt. 21), and on April 6, 2016, the grand jury returned an eight-count Superseding Indictment against Nichols and Fears. (Dkt. 51). At the outset of the proceedings, Nichols was appointed counsel: James Graham. After the Superseding Indictment was filed, and based upon

appointed counsel's concerns about the volume of evidence and the sensitive nature of the evidence which included the victimization of minors, the Court appointed a second attorney: Heather Winslow. (Dkts. 83, 86). Counsel litigated several pretrial motions, including a motion to dismiss the Superseding Indictment for violations of the Speedy Trial Act, which they presented at Nichols's insistence. (Dkt. 91). Recognizing their ethical duty not to present invalid legal arguments to the Court, the attorneys sought leave to file the motion, in which they provided the cases correctly stating the law. *See id.* at 1. The Court denied the motion in a written order. (Dkt. 123).

As a result of this episode, Nichols demanded appointment of new counsel, arguing that his appointed attorneys were working against his interests and he could not work with them. *See, e.g.*, (Dkt. 129) (Nichols's *ex parte* motion alleging that his attorneys were not effectively representing him because they were not further challenging the indictment); (Dkt. 142); (Dkt. 211); (Dkt. 213). Finding that there was no direct conflict of interest in that the attorneys presented Nichols' motion to the Court and correctly cited the law as they must, the Court denied Nichols request for a third attorney. Eventually, Nichols began to refuse to work with his attorneys and the Court granted counsel leave to withdraw due to irreconcilable differences but required that they stay on as stand-by counsel (Dkts. 137, 297); the Court denied Nichols's repeated demands for a third appointed attorney. *See, e.g.*, (Dkt. 226). The Court gave Nichols numerous warnings about proceeding *pro se* at trial, but he adamantly refused to work with stand-by counsel. Due to these and other issues, the Court extended the trial date by more than five months to allow Nichols adequate time for trial preparation. (Dkt. 165). Leading up to trial, Nichols's in-court behavior deteriorated and at times the Court had to order the U.S. Marshals to bring Nichols to court using whatever force necessary. *See* (Dkt. 242). As relevant to the arguments below, the proceedings

continued and on March 1, 2018, the Court conducted a competency hearing, which involved the testimony of two evaluating psychologists and other evidence. *See* (Dkt. 310) (Competency Hearing Tr.). At the conclusion of the hearing, the Court found Nichols competent to stand trial. *Id.*; (Dkt. 242).

Two weeks prior to the trial date, Fears pled guilty to one count of conspiring with Nichols and Brandon Wright[1] to engage in sex trafficking by force, threats of force, fraud, and coercion and one count of sex trafficking of Minor B (Ciara). (Dkts. 233, 236). Unlike Fears, Nichols proceeded to trial on March 12, 2018 and represented himself against the seven charges against him. During the first two trial days, Nichols participated in the proceedings until the afternoon when, after receiving numerous warnings, he was removed on account of outbursts and other improper behavior. *See, e.g.*, (Dkt. 289) (3/12/18 to 3/26/18 Trial Transcript excluding *Voir Dire*, hereinafter "Tr.") at 191.[2] After he was removed, he was placed in a satellite courtroom with a live video and audio feed of the proceedings with one stand-by counsel; the other stand-by counsel assumed representation. After these first two days, however, Nichols controlled his behavior enough to remain in the courtroom and participate fully in trial until it concluded on March 26, 2018. Notably, Nichols repeatedly conferred with stand-by counsel throughout and they stepped up as regular counsel only when he was removed from the courtroom or at other critical junctures, such as moving to dismiss, participating in the jury instruction conference, and questioning Nichols when he testified in his defense at Nichols' request. *See id.* at 1457–74, 1478–1539, 1657–1714.

---

[1] Wright, whose involvement in the facts of this case are described herein, also pled guilty to one count of conspiracy to engage in sex trafficking by force, fraud, and coercion. *See United States v. Brandon Wright*, No. 16 CR 597 (Dkt. 14) (N.D. Ill.).

[2] The transcript page numbers referenced throughout are those listed on the electronic filing header.

At trial, although Nichols admitted that he managed escorts, he argued that he did not force the women and girls to do anything—they choose to prostitute and they always had the option to leave him. Regarding the ability of the women and girls to pick up and leave, the government presented evidence that they lacked money, housing, and support and that they were in a relationship with Nichols which was both abusive and controlling. The government presented the testimony of an expert witness that victims of sex trafficking often choose to stay with their traffickers because they do not have anywhere else to go and the psychological control of the trafficker keeps them compliant. In addition, this expert witness testified as to the various restraints that sex traffickers use to keep victims from leaving, including psychological restraints, like intimidation, threats, and manipulation. The manipulation can include romance and false promises of a better future for the victims. Here, the government also presented evidence that Nichols made various promises to the women involved (for example, to help them get an apartment or regain custody of children) and that he fostered intimate relationships with the women as a way to control them.

In addition, the government presented evidence that Nichols maintained a culture of fear in his business as another means of control. Nichols admitted to physically abusing various women and girls, but he argued that all of the violence was related to personal matters, not business—that is, prostitution. Here, the government introduced evidence that Nichols had certain rules for the women and girls who worked for him—rules related to prostituting. When those rules were broken, such as when one of the women texted another pimp or when the women slept through calls from potential customers, Nichols beat them. In addition, the government presented testimony from each victim-witness that Nichols frequently physically abused other women and girls in their presence. Regardless of the reason for the abuse, the victims testified that it made

them fearful and compliant with his business rules so that they might avoid physical abuse directed towards them or towards others—who were oftentimes their friends.

As to the conspiracy, Nichols argued that he did not have an agreement with anyone—not Fears and not Wright—to commit sex trafficking. If anything, he and Fears engaged in similar, but separate, businesses. The government, however, introduced evidence that Nichols and Fears together recruited women and girls to join their violent sex-trafficking enterprise, some of the woman and girls worked for Nichols and then Fears (or vice versa) especially when one of the two was incarcerated or otherwise unable to "manage," they traveled around the Chicagoland area and the country (often times driven by Wright) with these women and girls and usually one if not both men stayed at the hotels with the women, and they shared the money the women made from engaging in commercial sex acts. Further, the government presented evidence about how Wright drove the women and girls to hotels, strip clubs, and outcalls (or trips to engage in commercial sex acts at a customer's house) at Nichols's direction and also to purchase supplies and food for the women and girls as well as the Visa gift cards that Nichols used to purchase the ads he ran on Backpage.com—a website used for advertising commercial sex acts that is hosted on servers maintained outside of Illinois. For these tasks, Nichols paid Wright at a daily or weekly rate, depending on how much money Nichols was making from the women and girls at that time.

After deliberating, the jury convicted Nichols of one count of conspiracy to commit sex trafficking and five substantive counts of sex trafficking under 18 U.S.C. § 1591. He was acquitted of one count of sex trafficking.[3] After trial, Nichols agreed to work with counsel and they were reappointed. (Dkts. 271, 273). Through counsel, Nichols now moves for judgment of acquittal,

---

[3] As to Count 4, which involved Minor A, the jury found Nichols guilty of trafficking by force, threats of force or coercion. The jury did not find that Nichols knew or recklessly disregarded that Minor A was a minor.

*see* Fed. R. Crim. P. 29, or alternatively, for a new trial, *see* Fed. R. Crim. P. 33. Nichols raises

multiple (at times duplicative) grounds in support of a judgment of acquittal or a new trial, which

amount to the following 18 objections, listed in chronological order:

1. the Court erred in denying Nichols's motion to dismiss on speedy trial grounds, (Dkt. 279) at (1)(b);

2. the Court erred in denying Nichols's motions for appointment of new counsel, *id*. at (1)(a);

3. the Court erred in finding Nichols competent to stand trial and in allowing Nichols to proceed *pro se* because he was incapable of representing himself, *id*. at (1)(c), (d) & (Dkt. 294) at (1);

4. the jury was not fair and impartial because Nichols knew one of the jurors, (Dkt. 279) at (1)(e);

5. the government committed outrageous conduct by presenting false evidence at trial that misled the jury, *id*. at (2)(a), (b), (c);

6. the Court improperly limited the cross examination of one victim witness and generally erred in sustaining objections to Nichols's cross examination of all government witnesses, *id*. at (3), (4), (5);

7. the Court erred in admitting testimony of other crimes, wrongs, or acts of Fears, *id*. at (10);

8. the Court generally erred in admitting hearsay evidence, *id*. at (11);

9. the Court erred in admitting physical evidence, *id*. at (18);

10. the government's closing argument was improper and was unduly prejudicial and the Court erred in overruling Nichols's objections to the government's closing argument, *id*. at (7), (8), (12), (20);

11. the Court erred in preventing Nichols from arguing the inconsistencies between the allegations in the Superseding Indictment and the evidence adduced at trial, *id*. at (21);

12. the jury instructions improperly constructively amended the Superseding Indictment and altered the level of proof necessary for the government to prove the elements for conviction, *id*. at (6) & (Dkt. 294) at (2);

13. the evidence was insufficient to sustain a conviction of Nichols on any count, (Dkt. 279) at (9);

14.     the government failed to prove every essential element of the offenses charged, *id*. at (13);

15.     the verdicts were against the manifest weight of the evidence and were not supported by substantial evidence, *id*. at (14), (15);

16.     the cumulative errors denied Nichols due process of law, *id*. at (16), (17);

17.     the indictment and proceedings were fundamentally and manifestly unfair; the defendant was denied his right to due process of law, to confront the evidence and witnesses against him, and to the assistance of counsel according to the Fifth and Sixth Amendments of the United States Constitution; due process and fundamental fairness required the setting aside of the guilty verdicts, *id*. at (19), (22); and

18.     "The defendant hereby raises and alleges all error that may appear from the entire record in the instant cause." *id*. at (23).

## DISCUSSION

### I.     Rule 29 Motion for Judgment of Acquittal

To begin, Nichols raises a challenge to the sufficiency of the evidence against him, arguing that (1) there is insufficient evidence to sustain a conviction beyond a reasonable doubt, (2) the government failed to prove every element of the offenses charged, and (3) the verdicts were against the manifest weight of the evidence. *See* (Dkt. 279) at (9), (13)–(15). Federal Rule of Criminal Procedure 29(a) provides that, "[a]fter the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." *See United States v. Kohli*, 847 F.3d 483, 489 (7th Cir. 2017). A court will overturn the jury's verdict only if, "after viewing the evidence in the light most favorable to the government, the record is devoid of evidence from which a reasonable jury could find guilt beyond a reasonable doubt." *United States v. Wrobel*, 841 F.3d 450, 454 (7th Cir. 2016) (quoting *United States v. Campbell*, 770 F.3d 556, 571–72 (7th Cir. 2014)); *see also United States v. Wilson*, 879 F.3d 795, 802 (7th Cir. 2018) (noting that, for this inquiry, the court examines the evidence as a whole, including that presented by the defendant);

*United States v. Presbitero*, 569 F.3d 691, 704 (7th Cir. 2009). In other words, a court will "set aside a jury's guilty verdict only if 'the record contains no evidence, regardless of how it is weighed,' from which a jury could have returned a conviction." *Presbitero*, 569 F.3d at 704 (quoting *United States v. Moses*, 513 F.3d 727, 733 (7th Cir. 2008)).

"In challenging the sufficiency of the evidence, [a defendant] bears a heavy, indeed, nearly insurmountable, burden." *United States v. Warren*, 593 F.3d 540, 546 (7th Cir. 2010) (citation omitted); *cf. United States v. Jones*, 713 F.3d 336, 339–40 (7th Cir. 2013) (he height of the hurdle depends directly on the strength of the government's evidence). In other words, a "defendant faces an uphill battle in challenging the sufficiency of the evidence." *United States v. Orlando*, 819 F.3d 1016, 1021 (7th Cir. 2016). It follows that under Rule 29, courts "do not reassess the weight of the evidence or second-guess the trier of fact's credibility determinations." *United States v. Arthur*, 582 F.3d 713, 717 (7th Cir. 2009); *see also United States v. Severson*, 569 F.3d 683, 688 (7th Cir. 2009). Instead, "[s]orting the facts and inferences is a task for the jury." *Warren*, 593 F.3d at 547.

## A.    Counts 2, 3, 4, 6, and 8:  Sex Trafficking

To sustain the convictions under the Trafficking Victim's Protection Act ("TVPA"), 18 U.S.C. § 1591(a), in Counts 2, 3, 4, 6, and 8 of the Superseding Indictment, the government must prove beyond a reasonable doubt that:  (1) Nichols knowingly recruited, enticed, harbored, transported, provided, obtained, or maintained Betty Jo (for Count 2), Michelle (for Count 3), Minor A[4] (for Count 4), Marzett (for Count 6), and Jameela (for Count 8), or knowingly benefitted financially or by receiving a thing of value from participating in a venture that recruited, enticed, harbored, transported, provided, obtained, or maintained the respective women and girls;

---

[4] Minor A was 13 years old at time she was around Nichols in mid- to late 2014. Minor A is still a minor and she testified at trial using an alias rather than her actual name. She is referred to as Minor A throughout this Opinion.

(2) Nichols knew or recklessly disregarded the fact that force, threats of force, or coercion would be used to cause the respective women and girls to engage in a commercial sex act; and (3) the offense was in or affecting interstate commerce. 18 U.S.C. § 1591(a); *see also United States v. Carson*, 870 F.3d 584, 592 (7th Cir. 2017); *United States v. Thompson*, 864 F.3d 837, 840–41 (7th Cir. 2017); *United States v. Woods*, 695 F. App'x 949, 953 (7th Cir. 2017) (finding sufficient evidence to sustain sex-trafficking convictions).

The government's evidence at trial was framed by the testimony of Dr. Sharon Cooper, a sex trafficking expert who has testified multiple times as an expert in the Northern District of Illinois and elsewhere. Dr. Cooper explained the desperate situations victims find themselves in that make them easy targets and the relationship dynamics between traffickers and their victims. She first explained that traffickers typically recruit vulnerable individuals to work for them, such as runaways, disenfranchised children, individuals with significant adversity in their lives, children with mental illness or even simply individuals with low self-esteem (meaning they may be more easily manipulated), and young mothers—particularly those who are working to regain custody of their children. Tr. at 208–14. For these individuals, traffickers promise a "dream" life in exchange for the work: the money they make will go to a house and family in the future and that "even though they may have to do a lot of things they don't want to do at this point, that's going to end because the pimp is going to make sure that they have a wonderful life in the end." *Id*. at 211–12. In this way, traffickers sometimes use love and romance to recruit victims and make them feel like they belong to a new family. *Id*. at 215–17. Once they are part of the so-called family, victims may not feel victimized because everyone is experiencing the same things, which normalizes the overall experience. *Id*. at 220, 230 ("Almost never do the victims get to keep the money that

they've made. And they're just—they're just sort of brainwashed to believe that this is how the family works and he is the person who gets to have all of the money.").

Dr. Cooper explained the different tactics that traffickers use to make their victims more compliant and easier to control, including romance, rewards for good behavior, drugs, and violence—both physical violence and threats of violence. Traffickers typically have rules that their victims must follow and the most common consequence for broken rules is battering, so victims often are subject to violence when, for example, they make eye contact with other pimps, fail to bring in a certain amount of money per day (known as a "quota"), or are not subservient. *Id*. at 229–32. Victims sometimes view the punishment as their fault, "not the fault of the trafficker who is the one beating them up" because after a beating the trafficker may "say to the victim that they didn't want to do that, it was the victim's fault, they shouldn't have made them do that, and they need to to[e] the line, they need to bring in their amount of money, they need to be respectful, et cetera, so that he will not have to resort to those types of behaviors again." *Id*. at 217, 224, 239.

Within this framework, the government presented testimony from the six victims listed in the Superseding Indictment (Betty Jo, Michelle, Minor A, Ciara, Marzett, and Jameela). Betty Jo, who was also known as "Becky," testified that she first met Fears when he sent her a message online, indicating that he wanted to work with her and they could "build a future together." She understood that Fears was asking to be her pimp. At the time of the message, which was sent sometime in 2012, Betty Jo was 25 and homeless, living out of a hotel in Lansing, Illinois. She agreed to meet Fears and he brought Nichols along for the meeting. Fears told Betty Jo that if she worked for him, the two would take trips together and could even share a car and apartment. *Id*. at 776–78. She agreed to work for him (performing commercial sex acts with customers obtained from the Internet), but after a few weeks she decided to work for Nichols instead.

Betty Jo worked with Nichols in 2012 and then again in 2014. She testified that the two had a "business relationship" and that Nichols exercised considerable control over everything she did. For example, he posted her pictures on Backpage to solicit costumers and he decided how often to post them; he set her work schedule-- seven days a week, twenty-four hours per day, and only he could decide if she could have a day off; he instructed her to answer all calls or texts from customers—which she received on a cellphone Nichols provided for her—regardless of the time that they came in; he set her rates; he required that she give him all of the money she made from her customers; and he would not allow her to talk to any other pimps or any men who were not customers. *Id*. at 784–87, 823, 837. To monitor compliance, Nichols would check her phone for missed calls or texts to prohibited individuals. If he saw something he did not like on her phone, Nichols would yell at or smack her. *Id*. at 787. Betty Jo testified that there were plenty of days that she did not want to perform sex acts, but she "still had to do them" or risk getting in trouble with Nichols. *Id*. at 823; *see also id*. at 785 ("Q. What would happen if you didn't answer the phone? A. He—we'd get yelled at or in trouble."). She testified that on a busy day, she would see somewhere between ten and twenty customers and make as much as $1,000, which she turned over to Nichols in full. *Id*. at 784–85.

With regard to living arrangements, Betty Jo testified that she stayed in rooms at national hotel chains (*e.g.*, Days Inn, Red Roof Inn, Extended Stay) paid for by Nichols and sometimes rented in her name. She would perform commercial sex acts in these rooms, so they typically had two beds: "One to work on, and then one to sleep on." *Id*. at 809–11. Nichols also took her on trips outside of Illinois to work. For example, Betty Jo described a trip to Minnesota that she took with Nichols, Little Baby, and Kaila (other women who worked for Nichols) in or around December 2012. *Id*. at 805–06. She also discussed a trip she took to Memphis in October 2014,

where again Nichols posted her ads on Backpage, she worked, and she gave the money to Nichols. In addition to paying for the hotel rooms, Nichols paid for Betty Jo's other living expenses, such as food, clothes, hair, and nails. Nichols also supplied Betty Jo with drugs; at the time, she used crack cocaine and marijuana to get through the day. Just like he had rules about how and when to work, Nichols had rules about drugs: Betty Jo was only allowed to get drugs from him and he sometimes withheld drugs from her. *Id*. at 804–05.

Nichols once caught Betty Jo and another woman who worked for him, Daisy, in a hotel room smoking crack cocaine that they got from a Backpage customer; he smacked them both in the face. *Id*. at 796–97. This was one of about five or six violent episodes Betty Jo recalled. For example, at a hotel in Lansing with three other women in the room, Nichols found out that Betty Jo was texting Fears (who, despite being Nichols's friend and co-conspirator, was still another pimp) and he slapped her in the face so hard that she thought her ear was bleeding. *Id*. at 801. On a different day at the same hotel, Betty Jo and Nichols got in a fight. After she hit him, he hit her. She fell to the floor and ended up with a black eye and a busted lip. *Id*. at 802–03.

As for Michelle, whose nickname was "Molly," she testified that after a childhood spent with relatives, in foster care and in group homes, she moved to Chicago from New York (leaving two children behind) at 22 years-old without any connections; she almost immediately met Nichols in a hotel where she was working and began prostituting herself for him. *Id*. at 536–41. She worked for him on and off for approximately two and a half years. Like Betty Jo, Michelle testified that she had sex with customers—recruited from Backpage with ads placed and paid for by Nichols—in various hotel rooms paid for by Nichols with cash from prostitution but placed under someone else's name (for example, hers or Wright's). *Id*. at 549–61. After the customers left, Nichols would count the money in front of her to make sure none of it was missing.

Michelle testified that Nichols decided what to do with the money. *Id*. at 540, 563–69. The evidence introduced at trial reflected that, in addition to buying the hotel rooms for himself and the women, Nichols used the money to buy condoms, toiletries for the women and girls, food, drugs, clothes for himself, work clothes for the women and girls, travel expenses, phone bills, and to support and promote his aspiring rap group, the Hit Squad, among other things. Like Betty Jo, Nichols would monitor Michelle's phone to make sure that she was not breaking his rules. *Id*. at 563–68. He required that she work most every day of the week, at least in the beginning, seeing as many as seven customers per day, and she testified that Nichols gave her cocaine and ecstasy to stay awake and work. Again, similar to Betty Jo, she was not allowed to get drugs from anyone other than Nichols. She worked even when she did not want to—for instance, when she was menstruating—because "I didn't really have a choice. It wasn't a choice whether I wanted to work or not." *Id*. at 579–581. She testified that at times she worked without sleep for multiple days in a row even though she did not want to. She could not even leave the hotel to get food or toiletries; either those would be purchased and brought to her so that she did not miss any calls or she was required to get Nichols's permission to leave to get them. *Id*. at 579–80, 627–31.

Michelle generally testified that when she did something that Nichols "didn't like or something that upset him or something that didn't pertain to his rules or it didn't fit his criteria of what [she] was supposed to be doing," he would physically abuse her or deprive her of things she needed. *Id*. at 581–82. She described these things he did not like as falling asleep and missing calls from potential customers, telling Nichols that she did not want to do something, or talking back to him. *Id*. at 640. She called Nichols's beatings, which typically took place in the hotel rooms where she was living and working, "very, very close to torture." *Id*. at 582. Sometimes others were in the room when Nichols beat her, like Fears. *Id*. at 583.

One significant beating occurred in April 2014, when Nichols discovered text messages between her and Fears when he was checking her phone. After finding these messages, Nichols repeatedly struck Michelle's hand and her back with a wooden hanger. He made her get into a car driven by Wright and Nichols continued to beat her there. Nichols was in the passenger seat and Michelle was in the back of the car when he threw her flip phone at her head, causing her to bleed profusely. Ultimately, Wright drove to a hospital and Nichols made Michelle get out of the car. She ended up needing three stiches to close her head wound. *Id*. at 584–88. Wright, who also testified at trial, corroborated Michelle's account by recalling that she was badly bruised when she got in his car and already had a black eye. He saw Nichols throw the phone at Michelle's head, which caused her to bleed "real bad" and get blood all over the car. According to Wright, Nichols told him that he had punched and kicked Michelle and beat her over the back repeatedly with a wood coat hanger from the hotel room because she was being disloyal by talking to Fears. *Id*. at 1283–84. Wright saw Michelle the next day and described her: "She looked bad. She had a black eye. She had bruises all over her body. She could barely move." *Id*. at 1284. When Nichols took the stand, he too admitted that this incident happened, but he disputed its severity. *Id*. at 1510–12 ("She asked me could she have her phone back, and I—shit, I gave—I mean—excuse me. I gave it to her. I got upset.").

In addition to working in the Chicagoland area, Michelle travelled with Nichols, Fears, and others to work. She testified about a 2014 trip to Atlanta she took with Nichols, Fears, Stallion, and Marzett. Wright drove. While there, Nichols poster her and Stallion on Backpage; Stallion had sex with customers in exchange for money in a hotel room and gave the money to Nichols. Marzett danced at a strip club and gave the money she earned to Nichols. *Id*. at 610–12.

Next, Minor A testified that she began to work, stripping and giving the money to Nichols, in or around June 2014 when she was only 13 years-old. She essentially was homeless—she had been running away from home since she was 10 and she would roam the streets. *Id.* at 1082–94. In exchange for working, Nichols paid for Minor A's hotel rooms and food and he provided marijuana and alcohol if she wanted it. He also told her that he would help her get an apartment someday. After working at the club for a few days, Nichols began to post Minor A's pictures on Backpage and she started having sex with customers using condoms he supplied. She gave him all the money she made. Minor A had sex with strangers at various hotels ("incalls") and she also traveled to customers' houses to have sex there ("outcalls") with Nichols's approval. She recalled one particular outcall to a customer in Indiana; Wright drove and Candace came along. *Id.* at 1108–09. This went on until September 2014 when Minor A was arrested. *Id.* at 1094–95. While detained, she called Nichols to bail her out. He said he would but that she "better be ready to suck some dick and rub some feet when you get out, bitch, for putting me back." *Id.* at 1127–28. Minor A understood Nichols to mean that she would have to pay him back by having more sex with men.

During the time she worked for Nichols, Minor A testified that he threatened her, for example by saying he would beat her up if any of the money she earned "came up missing." *Id.* at 1097; *see also id.* at 1112 (when asked what Nichols would do if any money was missing, Minor A replied "he'll beat our ass"). Nichols made the same threat if he found out that Minor A did not answer a phone call from a Backpage client, because she was required to answer every call. *Id.* at 1114. As a result, Minor A always answered her calls because she "took him up on his word, that if I missed a call, he'll beat my ass." *Id.* Because of these threats, Minor A worked even when she did not want to, like while she was menstruating or when she had a painful infection.

Minor A testified about a time when Nichols was violent with her: they were in a hotel room and Nichols slapped her in the face during an argument. *Id*. at 1097, 1122, 1173. She had braces, and Nichols's hard slap caused her lip to get stuck in the braces and bleed profusely. *Id*. at 1122–23. After this incident, Minor A testified that she did not talk back to Nichols again out of fear of getting hit. *Id*. at 1123. Minor A also testified about witnessing Nichols's violence towards others, like when he choked Candace or hit her in the face if she did not do what he told her to do. *Id*. at 1101–02. Witnessing this violence made Minor A nervous that she would Nichols's target if she ever "got out of line with him."

Another victim, Marzett (or "Celeste"), testified at trial. When she was a child, she frequently ran away from the home she lived in with her aunt. Marzett explained that the two had a bad relationship because Marzett had disclosed to her aunt that she was raped as a child, but her aunt did not believe her. *Id*. at 997–98. Marzett later had two children and she turned to stripping and dancing to support them, because she did not have any other job and she was having troubles with her family and she did not want to ask them for money. *Id*. at 1000. In 2012, when she was working at a strip club called Arnie's, she met Fears (who was with Nichols at the time) and the two exchanged phone numbers. Marzett eventually called Fears to come get her from a hotel where she was staying because she "was at a bad point at the time, so [she] was really ready to leave where [she] was at anyway." *Id*. at 999–1000. Fears picked her up and took her to a hotel in Lansing; Candace was driving the car and Nichols was there. At first, she thought she might date Fears, but she later learned that he wanted to be her pimp. *Id*. Marzett continued working at Arnie's—stripping and also performing sex acts—but she started giving all of the money she made to Fears. *Id*. at 1007–08. She did so in part because Fears told her that he would help her "save money and get everything" she needed. *Id*. She also saw Backpage customers during this time.

Marzett was at a hotel with Fears when he was arrested. Immediately afterward, Fears and Nichols worked out the details and Marzett began to work for Nichols. *Id.* at 1015; *see also id.* at 384 (Jameela testified that Marzett first worked for Fears and when he "got locked up, . . . she came join up our team and started working for [Nichols]."). Marzett testified about the rules with which she had to comply while working for Nichols (many of which were described by the other women), including rules that she was not allowed to have eye contact with any other pimps and that she was required to give all of the money she earned to Nichols. *Id.* at 1016. She described Nichols's personality as "aggressive," noting that she saw him "get made easy and get frustrated at the girls a lot easily." *Id.* at 1015–16. Marzett witnessed Nichols act violently towards other women who worked for him (like Little Baby and Candace), which made her feel "nervous and scared" that she would do something wrong and be at the receiving end of Nichols's violence, so she "basically did everything that he wanted [her] to do." *Id.* at 1018–19. She later left Nichols after he yelled at her for asking to go see her daughter. *See id.* at 1305, 1355 (Wright testified that Nichols threatened to beat up Marzett if she kept going back and forth from her grandmother's house to the hotel because Nichols wanted her at the hotel "working all night"). She feared that he would come after her. *Id.* at 1024–25. Indeed, the government introduced a jail call between Nichols and Kaila where Nichols berated Kaila for allowing Marzett to leave and told her to go after Marzett to "get my bitch back" or "get my money back." *Id.* at 1636.

Finally, Jameela (or "Icis") testified that she worked for Nichols from 2012 to 2014.[5] Jameela originally met Nichols in 2009 when she was pregnant and living at a homeless shelter. In 2012, after living briefly in another state, Jameela returned to Illinois and began working with

---

[5] Jameela testified about working for Nichols in 2009 to 2010, which served as the basis for Count 7. Nichols was acquitted of this Count and Jameela's testimony about that time period therefore is omitted from this analysis except to the extent it is relevant to her later involvement with Nichols.

Nichols primarily because he promised to help her regain custody of her young son, which she lost while working for Nichols previously. *Id.* at 359, 430–32. During this time, Jameela stripped and performed sex acts at a strip club in Markham, Illinois. In addition to that, Nichols created, paid for, and posted ads for Jameela online at Backpage. *Id.* at 361, 365. Different from the other women and girls, Nichols did not permit Jameela answer the calls that came in response to her ads because she had a speech impediment and he was afraid that she would "run the customer away." Like the other women, Jameela gave all the money she earned to Nichols. *See id.* at 419 (Jameela testified that Nichols would go through "our stuff and take our money and then put us out of [his] car"). Nichols set her rates and her working days, and he required that she bring in a certain amount of money per day. *Id.* at 362–64. If she did not meet her quota, so to say, Jameela testified that Nichols got mad and would make her stay up and have sex with more customers to try to make more money without sleeping. *Id.* at 417–19, 443. Like the other women and girls, Jameela was subject to Nichols's many rules, including in addition to those described above no boyfriends and no talking to family without going through Nichols. *Id.* at 456.

Jameela testified that Nichols was violent with her: he smacked her in the face on several occasions, like once when he hit her after she said something he did not like. *Id.* at 385–86. He also made threatening comments about beating her if she had a boyfriend or shooting any boyfriend she might have. *Id.* at 391. In addition to the physical abuse and threats, Nichols mocked Jameela's speech impediment and would tell her that no one would want her due to it. For example, Wright testified that Nichols would call her a "retarded bitch a lot of the times . . . because the way she talked." *Id.* at 1275.[6] Jameela testified that there were days when she did not want to

---

[6] Indeed, on cross examination Nichols asked Jameela why she "talk[s] like that," asking her if it was because she was intoxicated or high, if there was something wrong with her brain, or if she was "retarded [or] stupid." She confirmed that she has a speech impediment. Tr. at 408.

work for Nichols, but she "just [went] work because, like I say, I don't do the drama or—after he hit me, I don't want that situation happen again, so I just go work and just—but people at work know I don't want to be there because how my mood is." *Id*. at 457. Nichols did not help Jameela regain custody of her son and she eventually left him for a second time. Nichols kept all of the money she earned. *Id*. at 400.

All of the above accounts of violence were corroborated by Wright. As relevant, Wright met Nichols and Fears at a strip club and worked as Nichols's driver continuously from July 2013 until October 2014. *Id*. at 1196. He generally testified that he knew Nichols to control the women and girls who worked for him through the use of threats of violence and actual violence, that Nichols was always "hitting on them beating them up, been talking real disrespectful to them." *Id*. at 1210–11; *see id*. at 1253 ("He would beat them up, punch them, slap them, kick them."). Consistent with the testimony recounted above, Wright testified that the beatings were the consequence if one of Nichols's rules was broken, like talking back to him, failing to turn over all of the money made from sex acts, or missing a call from a customer. *Id*. at 1127–28, 1234–35. With regard to specific events, Wright recalled witnessing Nichols slap Candace and drag her across the floor at a hotel in Lansing after she had become upset that her clothes were at Kaila's house, and he saw Nichols physically abuse Candace while she was pregnant. *Id*. at 1257–59. Wright also saw Nichols act violently towards Kaila. One time when she did not want to go to work at a strip club, Wright drove Nichols to Kaila's house and Nichols beat Kaila in front of her kids, dragged her to the car, and then dropped her off at the club where she went to work. *Id*. at 1266–67. Another time Nichols repeatedly slapped Kaila in Wright's car for talking to other women who worked at the strip club. *Id*. at 1267–68. In addition, Wright testified that he either

had seen or knew about instances when Nichols was violent with Michelle, Stallion, Jameela, Minor A, Betty Jo, and Little Baby. *Id*. at 1280–1312.

Like Wright, Betty Jo, Michelle, Minor A, Marzett, and Jameela all testified about witnessing Nichols physically abuse other women and girls, many times at the hotel where they were all staying. For example, Betty Jo testified that one time while she was in the same hotel room as Daisy, Nichols entered the room to find that Daisy was asleep and not answering calls from potential Backpage customers. Nichols "smacked her out of her sleep" because she was supposed to be answering her phone. *Id*. at 796–98. The women and girls also described countless instances wherein Nichols hit, punched, kicked, and beat Candace or Kaila—both of whom had worked for him for years, had children with him, and were considered his "bottoms," or those women who had worked their way up to the top of the sex trafficking organization and who begin to supervise and train other women and girls. *See id*. at 216 (testimony of Dr. Cooper); *see also id*. at 374–75 (Jameela testified that she saw Nichols hit Kaila across her chest with a small baseball bat in a car on the way to a strip club), 426–27 (Jameela testified that Nichols beat Candace every other day and Candace still would go to work after that), 596 (Michelle testified that Candace was beat by Nichols because "[s]he could have talked back. She could have tried to leave. She could have refused to work. Anything."), 594–600, 787–89 (Betty Jo testified that she saw Nichols drag Candance across the room by her hair), 789–94, 814–17, 1101–02 (Minor A testified that she saw Nichols choke Candace and hit her in the face).

Faced with this evidence, Nichols did not dispute that he was involved in prostitution, although he described it as "managing" or "promoting" the women. However, as to the sufficiency of the evidence, Nichols argues as he did in his mid-trial motion for dismissal that the government failed to prove that he used force, threats of force, or coercion to require anyone to commit any

sex trafficking act. (Dkt. 279) at 9; *see also* Tr. at 1459 (arguing in part that the government failed to prove "force, violence, threats, or coercion because none of the witnesses have testified—short of Brandon [Wright] who doesn't have personal knowledge of such—none of the other witnesses have testified that Mr. Nichols used force, threats, coercion, fraud to induce their participation in illegal or commercial sex acts."). This argument has two prongs. First, Nichols argued at trial that all of the women and girls he managed agreed to work with him and agreed to stay with him, despite knowing that they could leave at any time. Second, he argued that all of the physical violence described by the witnesses in the government's case was not related to his business, but was instead inflicted for personal reasons.

Importantly for this case, and for a general understanding of the complexity of sex trafficking in general, Dr. Cooper explained that victims frequently will stay with a trafficker because they have nowhere else to go. *Id.* at 235 ("If a victim has been recruited from being homeless and just sleeping on the streets, et cetera, and begging for food from restaurants, then just having a roof over their head is for them a step up from where they were."). In addition, Dr. Cooper testified that sometimes traffickers will manipulate their victims to get them to stay, for example by claiming that they will help a victim regain custody of her child or promising a romantic relationship and a future. She also explained that victims will leave and then return to traffickers because they feel stigmatized, and feel like it's difficult to survive financially without the trafficker, particularly if they have no education and low self-esteem. *Id.* at 236.

Given the testimony of Dr. Cooper, it was not surprising that the jury heard testimony on cross examination that the victims stayed with Nichols through horrific episodes of abuse and grueling work schedules and conditions or left him at least once (sometimes many times) and still returned. But the jury also heard evidence that the victims did not want to leave Nichols because

he gave them a place to stay, paid for their food and other needs, and gave them drugs; some also testified either that Nichols came after them when they left or they feared that he would. For example, Jameela testified that the women and girls had the option to leave "but not with our money." *Id*. at 419–20. Michelle testified that every time she left, Nichols "came after [her]. It ended up to not having a choice." *Id*. at 675. Betty Jo also testified that she did not have anywhere else to go if she left Nichols and he never gave her the money she earned while working for him. *Id*. at 819, 823. Marzett, too, feared that he would come after her if and when she left.

In addition, Michelle testified that she returned to Nichols more than five times because she had nowhere else to go, did not know anyone else in the area, and felt as though she had no other options. *See id*. at 541 ("Well, that was kind of like I didn't have anywhere to stay. And at that time, like, I was just fully—just everything I did was him. I just—I mean, all I knew was him."). She testified, "I really didn't want to be with him, but it wasn't a choice." *Id*. at 614. For example, the government introduced a recorded call that Michelle placed to Nichols in August 2014, where she asked him to bail her out and for "her old job back." She explained that she "just didn't want to be in jail and [she] knew he was the only person that would have came and got" her. *Id*. at 621, 714–15, 730–31. On the call, he threatened to come and find her if she left before paying off her debt. *Id*. at 621. Similarly, Jameela testified that she moved back to Illinois because she needed to be in state to fight for custody of her son. When she returned, she was "[b]ouncing from place to place with [her] friends" without a job, and Nichols contacted her. He told her that he would help her get a house and a car, that he would help her get back on her feet and regain custody of her son if she worked for him again. *Id*. at 359, 430.

At trial, because he represented himself with standby counsel, Nichols cross examined the women and girls who he allegedly trafficked and effectively elicited testimony from many of

them that they consented to prostitute themselves and they got into it willingly. Jameela, for one, testified on cross that she was neither threatened or forced to "be with" Nichols. *Id*. at 454–55. Michelle also confirmed that Nichols did not "force her to be a prostitute." *Id*. at 654. Betty Jo and Marzett testified similarly. *Id*. at 863, 1040. Minor A also testified that Nichols did not force her to engage in prostitution, even though she had never done so before. *Id*. at 1147–48, 1150. This testimony, too, was touched on by Dr. Cooper's expert testimony. For one thing, she explained victims may struggle to see themselves as victims or being forced because they may instead see any punishment from the trafficker as their fault or just something they have to endure to make him happy. *Id*. at 239. Sometimes they may also view themselves as part of the enterprise—an earner rather than a victim. *Id*. at 238–39. Both perceptions can make victims believe that the punishment is their fault. They may not see the situation as one in which they are being forced to work. *Id*. In addition to these issues with perception, she highlighted the distinction between "prostitution" and "trafficking": "A prostitution scenario is where you have an exchange of sex between two people. Trafficking scenario is when there's third party control." *Id*. at 246. Thus, as in *Carson*, whether the women willingly agreed to work as prostitutes is not the heart of the matter; it is whether they "willingly agreed to essential become enslaved—that is, to turn over all of their money and freedom and suffer abuse." *Carson*, 870 F.3d at 591.

Here, the testimony that the women chose to prostitute themselves stood in stark juxtaposition with the testimony that the women and girls routinely were beaten and threatened by Nichols for crossing him. On this point, Nichols admitted that he hit the women. He argued, however, that the violence was not connected to the business, that it was personal (such as violence in response to disrespect directed to Nichols on a personal level) and therefore wholly separate from prostitution. In other words, the violence was not used to force any of the women to engage

in commercial sex acts.  To be sure, on cross examination, Nichols elicited testimony concerning the personal, intimate, or even romantic relationships he had with many of the witnesses or other women, including Candace, Kaila, Stallion, Michelle, and Jameela.  But the government introduced evidence that the women and girls around Nichols were working for him nearly all day, every day and that even what Nichols described as "personal relationships" were part of his sex trafficking business and another way to control them.  *See* Tr. at 1554 (Nichols testified that he was managing escorts at all hours of the day and night).  Specifically, Nichols told his sister in a recorded jail call that Candace and Kaila were "hookers" and that he had sex with the women around him because that was part of his job.  *Id*. at 1277–78, 1613–15; *see* Gov't Ex. 209A. Jameela also testified that, although she had been intimate with Nichols, she only considered her relationship with him to be that of a "worker."  Tr. at 438.  When asked by Nichols why she felt this way in light of the fact that she was once pregnant by Nichols, she stated: "Like everybody else, you got other baby mamas on the team working for you and turning the money in, so that don't mean nothing."  *Id*. at 439–40; *see id*. at 440 ("As you said it, we was not in a relationship. As you stated, you—I was working for you.").

Nichols's personal and business relationships with the women and girls who worked for him were inextricable.  The jury heard ample uncontradicted testimony from Betty Jo, Michelle, Minor A, Marzett, and Jameela that Nichols used violence and threats of violence to enforce his business rules.  For example, Nichols slapped women who missed calls from potential customers, he slapped and beat women—including Betty Jo and Michelle—who talked to Fears without permission, he slapped women for taking drugs from customers, and he threatened to beat anyone who withheld money from him.  He yelled at girls who did not answer calls and acted like they did not want to work.  *E.g*., *id*. at 602 (Michelle testified that Nichols yelled at Little Baby for

this).  In other words, there was ample evidence that Nichols hit and threatened to hit women over money.  Wright testified that in training the women and girls to work for Nichols, Candace typically told them "don't talk back to Buck or do anything that's going to get on his bad side 'cuz there will be consequences and repercussions, which will be him beating them up."  *Id.* at 1227. What is more, Betty Jo and Minor A, who both testified about times that Nichols hit them, also testified that they only had business relationships with him.

Further, the victims testified that they became more compliant overall after Nichols beat them.  Jameela testified that she worked when she did not want to because she did not want Nichols to hit her again.  *Id.* at 457.  Michelle testified that Nichols's beatings made her feel like "nobody. Like nothing was good enough."  *Id.* at 583.  Minor A testified that she did not talk back to Nichols again for fear of getting hit.  *Id.* at 1123.  And Betty Jo, Michelle, Minor A, Marzett, and Jameela all discussed the numerous times in which they witnessed Nichols beat or choke other women who worked for him.  Regardless of the reasons for the beatings, all of the victims testified that witnessing Nichols's violence towards others made them upset and fearful of future violence directed towards themselves of others, so they tried to be compliant and to avoid anything that would make Nichols upset.  *See, e.g.*, *id.* at 598 (Michelle testified that she felt helpless when Nichols beat Candace because she knew if she intervened, she too would be beaten), 790 (Betty Jo testified, "I just tried not to do stuff to make him upset so he wouldn't hurt Cand[a]ce."), 792 (Betty Jo testified that when Nichols beat Kaila it hurt her feelings and made her upset), 1019 (Marzett testified that witnessing the violence made her "nervous and scared" that the same thing would happen to her, so she "basically did everything [Nichols's] wanted her to do" to avoid it), 1102 (Minor A testified that witnessing Nichols's violence made her nervous that she would be the target if she ever "got out of line with him").

Thus, the jury heard testimony from the victims that as a result of the violence they experienced and witnessed, they did things they did not want to do, like take calls from customers, work without sleep, or give Nichols all the money they made. In a rare and remarkable courtroom drama, they also were confronted directly by the man who they accused of this violence. The jury was able to listen to their testimony and judge their credibility and the jury unanimously believed that this violence was related to the business relationship of sex trafficking. In this same vein, Wright testified affirmatively that he saw Nichols "trick, force, or threaten" females to "prostitute themselves": "Seen you do it to all of them." *Id*. at 1355. All of this testimony regarding Nichols's violence towards the women who worked for him, particularly when combined with reasonable inferences from testimony about Nichols's control over the victims' prostitution work, is more than sufficient to support Nichols's conviction. *See, e.g.*, *United States v. Withers*, 2017 WL 2790562, at *3–4 (W.D. Wis. June 27, 2017) (testimony that the defendant hit his victims and others, he possessed a gun, victims were scared of the defendant, and they engaged in sex acts when they did not want to was more than enough evidence for the jury to reach its verdict).

As if the threatened use of violence and actual violence were not enough, the victim-witnesses also testified about how they knew Nichols to own and carry guns, which he would keep in safes or under the mattress at hotels and have at the ready. *Id*. at 391–92, 447–48 (Jameela testified that Nichols said that he would "blow people away" with the gun and told her that she "could come up missing and don't nobody care about [her] because [her] family stopped talking to [her]"), 822, 845–47, 862, 616, 676–78 ("You always had a gun on you. Didn't matter where you were."). For his part, Nichols confirmed that he had a gun (or guns) during the 2012 to 2014 time period, although he argued that he used them for protection of the women and girls who worked for him. However, Wright testified that Nichols kept the guns to protect his money. *Id*.

at 1208.  Wright also testified about an instance when he turned a gun—albeit a BB gun—on Candace.  Specifically, Wright stated that in Joliet, he and Nichols saw Candace walking down the street with another man, so Nichols shot Candace in the back and then in the face with a BB gun.  *Id*. at 1262–63.  Nichols confirmed on cross that he purposely shot Candace.  *Id*. at 1609.  The government also produced evidence that Nichols threatened to shoot Michelle in texts and social media messages.

Considering all of this evidence together, the government presented ample evidence that Nichols's violent behavior towards each of the victim-witnesses who testified at trial and his violent behavior towards other women and girls in their presence—regardless of the personal or business motivation—caused his victims to live in constant fear and submit to his rules and comply with demands to try to avoid his beatings and his vindictive actions.  Thus, a reasonable jury could find that Nichols used force, threats of force, and coercion to cause Betty Jo, Michelle, Minor A, Marzett, and Jameela to engage in prostitution.  Viewing the evidence[7] in the light most favorable to the government and not questioning the jury's credibility determinations or reassessing the weight of the evidence, *Arthur*, 582 F.3d at 717, the evidence is more than sufficient to sustain the convictions on Counts 2, 3, 4, 6, and 8, and Nichols's motion for acquittal on these counts is denied.

### B.      Count One:  Conspiracy to Commit Sex Trafficking

Count 1 of the Superseding Indictment also charged Nichols with conspiring to engage in sex trafficking with Fears and others in violation of 18 U.S.C. § 1594(c).  To convict a defendant of conspiracy, the government must prove beyond a reasonable doubt that the defendant

---

[7] In addition to the above described and other testimonial evidence, the government introduced Backpage ads posted by Nichols, text messages from victims' cellphones, posts from the social media site Instagram, hotel records, and recorded jail calls.

"knowingly and intentionally joined in an agreement with one or more other individuals to commit an unlawful act." *Orlando*, 819 F.3d at 1022 (quoting *United States v. Avila*, 557 F.3d 809, 815 (7th Cir. 2009)). Accordingly, the government must show that Nichols knew the essential nature and scope of the charged conspiracy and that he intended to participate in it. *Id*.

Multiple witnesses testified to the close relationship between Nichols and Fears, one in which they referred to each other as "Pops" and "Son." Nichols also testified that he and Fears had a "good relationship," who is eight years his junior: "that was my boy." Tr. at 1526–27. Although Nichols acknowledged throughout trial that Fears also "managed" women and girls, Nichols argued that he never actually sat down with either Fears and agreed to traffic women and teenage girls but that the two men ran completely "separate businesses." Yet, as to their coordination, the government elicited testimony from Wright and others about how Nichols and Fears worked together to engage in sex trafficking. *See, e.g.*, *id*. at 368–70 (Jameela testified that Fears worked with Nichols). For example, the government's evidence demonstrated that the two recruited women and girls—including minors—to join their teams together and the women and girls switched from working with Nichols to Fears or vice versa, either by choice or if one of the two was in jail. Betty Jo, Marzett, and Michelle all testified that they worked for both Nichols and Fears at certain points in time. A woman referred to as "Ms. Perfect" also worked for both Nichols and Fears. Specifically, Wright testified that she first prostituted herself for Nichols, but then Nichols "got tired of dealing with her" because she was "too emotional," so Wright drove her to the hotel where Fears was staying and Nichols "gave her to [Fears]." *Id*. at 1316–17.

Another victim who testified at trial was Ciara. She met Fears in a hotel when she was 16 years-old, and Fears shortly thereafter introduced her to Nichols. The two convinced Ciara to work for Fears in part because one of her good friends was working for Nichols and living in a hotel

with him. Nichols eventually took Ciara to another hotel where she met other women who worked for Nichols including Candace and where she worked having sex for money after Nichols took her pictures and posted them on Backpage. Nichols set her rates that night. *Id*. at 892–900. Ciara, however, ended up working only for Fears, which she did for about a year and a half. She preferred to work with him because she thought Nichols was "abusive. He beats his women." *Id*. at 961. Ultimately, she had experiences with Fears similar to those Betty Jo, Molly, Minor A, and Jameela had with Nichols. Meaning she had to work all day every day and follow Fears's rules and work constantly or risk punishment (that is, beatings, getting her face pushed in a toilet, or being denied food). *Id*. at 909–18. One time, she lied to Fears to have a night off and when he found out, he threw her to the floor, stomped on her, and broke one of her fingers. *Id*. at 921–22. Fears also supplied Ciara with ecstasy so that she could stay awake and work. *Id*. at 918. She testified that there were days she worked when she did not want to because "that was where I was at. It was either work or ain't no telling what else will happen." *Id*.

In addition to these joint recruitment and retention efforts, Nichols and Fears operated their sex trafficking operations together out of the same Chicagoland area motels and strip clubs in Lansing, Harvey, and Downers Grove to name a few. The two typically stayed at the same hotels and on the same floor. *E.g.*, *id*. at 876 (testimony from a Motel 6 employee that she observed Nichols and Fears at the hotel together and she saw Nichols almost daily in 2013, 2014). As an example as to how the two coordinated, Betty Jo testified that if Nichols was not at the hotel with her, either Wright or Fears was there and Fears sometimes performed a security function for Nichols's women. *Id*. at 798–99. Michelle also testified that Fears sought out Nichols's advice: "You all were always around each other. If he didn't know how to handle a female, he would come ask you. If he didn't know something about a female that just came from you or that knows

you, he would come to you." *Id*. at 686. In addition to working their girls in Chicago, Nichols and Fears took the women and girls to out-of-state locations together where they engaged in sex trafficking, including Tennessee and Georgia. *See, e.g.*, *id*. at 610–14, 1020–21, 1236, 1335–47.

Not only did they operate their sex trafficking businesses out of the same locations, Nichols and Fears shared the proceeds of their sex trafficking. Specifically, the jury heard testimony that Nichols sometimes would lend Fears money for clothes, food, or hotel rooms. These were rooms that were rented by Wright (or sometimes by the trafficked women) and ultimately paid for by Nichols. Other times, Nichols lent Fears money for Backpage ads. *Id*. at 908, 1201. Nichols and Fears—who were not employed—spent a majority of their time together in the hotels while the women and girls saw customers. All day long they collected money, played video games, smoked marijuana, and worked on Hit Squad music. Nichols was the CEO of the Hit Squad; Fears was the President. The shared profits of their trafficking was used to fund and promote the group, like to make Hit Squad merchandise and videos. *Id*. at 394, 425–26, 1206–07.

Nichols and Fears also worked together to maintain an environment of fear and intimidation over their women. In addition to the evidence about Nichols's violent behavior, Michelle and Betty Jo testified that Fears was present in rooms when Nichols battered them or others, like Candace or Stallion, and he did not intervene. *Id*. at 371, 583, 787–89. Fears also was violent with women, like Ciara and Ms. Perfect. Further, Wright testified about an instance where Nichols and Fears beat Ms. Perfect together in a hotel room in front of others. *Id*. at 1306.

At trial, Nichols argued that his "management" or "promotion" of women was completely separate from what Fears was doing, but at least one witness called Nichols and Fears "a team" and described them as "business partners when it came to promoting women." *Id*. at 685–87; *see also id*. at 943 (Ciara testified that Nichols and Fears did "not necessarily" work separately and

that Nichols "called the shots, and you know it."), 956 (Ciara testified that Nichols and Fears had a business relationship: "And any time Buck said to do something, it was done."). On this topic, Dr. Cooper testified that it is common for an older pimp to mentor a younger pimp by "teach[ing] them how to gain and maintain control over women and girls, and especially how to make as much money as possible from these—from these members of their stable." *Id*. at 234–35.

In any event, Nichols's attempt to distance himself from Fears ignores all of the evidence the jury heard about the arrangement between himself and Wright. Dr. Cooper testified that it is common for traffickers to have a network of sorts, which—especially for pimps who market girls online—includes "certain taxi drivers who they would be paying to transport the women and girls to the hotel." *Id*. at 234. That's what happened here. Wright testified that Nichols asked him to "help out with rides, help him to get him and his girls to and from the clubs, to and from the hotels, and to, you know, do outcalls." *Id*. at 1195, 1357 ("I admitted I was your driver; that I helped you out with the girls, driving you and the girls to and from hotels; to do out-calls to and from the different strip clubs."). For this work in support of his sex trafficking organization, Nichols offered Wright $50 per day (in the beginning) and gas money—money that Wright understood Nichols got "from pimping." Wright accepted Nichols's offer and drove various women and girls, such as Betty Jo, Michelle, Minor A, Marzett, and Jameela, around Illinois and the country at Nichols's direction from July 2013 until Nichols was arrested in late 2014. *Id*. at 1195–96; *see also id*. at 371 (Jameela testified that Wright would drive her to outcalls, strip clubs, to the store, or to get something to eat), 809 (Betty Jo testified that Wright "would drive girls to outcalls, and he was just the chauffeur"), 1108 (Minor A's testimony about "outcalls" to Indiana; Wright drove). Wright also drove to stores like pharmacies to get things Nichols and the women needed like condoms, toiletries, and Visa gift cards to pay for Backpage ads, which Nichols would pay for

either in person or by giving Wright money.  Wright purchased cell phones for the girls and at

Nichols's direction and with money provided by Nichols.  Wright also drove Nichols wherever he

wanted to go.  *Id.* at 1202–05.  Wright worked with Nichols to rent the hotel rooms in his own

name and that he paid for rooms with cash Nichols gave him.  Overall, Wright was aware of the

intricacies of Nichols's trafficking operation—from the procedure the girls used to get customers

and notify Nichols about the customers to Nichols's rules and the consequences for breaking them.

He testified that he assisted the operation by doing whatever Nichols asked of him for more than

a year.  *See United States v. Cephus*, 684 F.3d 703, 707 (7th Cir. 2012).

Thus, there was overwhelming evidence that the jury could rely on to find that Nichols

conspired with others to engage in sex trafficking.  In other words, the evidence described above

is more than sufficient to sustain the jury's verdict as to Count 1, and the motion for acquittal is

denied.

## II.        Rule 33 New Trial Motion

Alternatively, a court may vacate a judgment and grant a new trial upon the defendant's

motion "if the interest of justice so requires."  *See* Fed. R. Crim. P. 33; *see also United States v.

Conley*, 875 F.3d 391, 399 (7th Cir. 2017); *United States v. Smith*, 674 F.3d 722, 728 (7th Cir.

2012).  Unlike a motion for acquittal, the Court need not view the evidence in the light most

favorable to the government and it may consider the credibility of the witnesses.  *See United States

v. Washington*, 184 F.3d 653, 657 (7th Cir. 1999).  Rather, "a defendant is entitled to a new trial if

there is a reasonable possibility that a trial error had a prejudicial effect upon the jury's verdict."

*United States v. Van Eyl*, 468 F.3d 428, 436 (7th Cir. 2006); *see also United States v. Kuzniar*, 881

F.2d 466, 470 (7th Cir. 1989) ("[C]ourts have interpreted [Rule 33] to require a new trial in the

interests of justice in a variety of situations in which the substantial rights of the defendant have

been jeopardized by errors or omissions during trial."). However, "the exercise of power conferred by Rule 33 is reserved for only the most extreme cases." *United States v. Peterson*, 823 F.3d 1113, 1122 (7th Cir. 2016) (citing *United States v. Morales*, 902 F.2d 604, 606 (7th Cir. 1990), *amended* 910 F.2d 467 (7th Cir. 1990)). In other words, the Court should grant a motion for a new trial only if "the evidence 'preponderates so heavily against the verdict that it would be a manifest injustice to let the guilty verdict stand.'" *Conley*, 875 F.3d at 399 (quoting *United States v. Reed*, 875 F.2d 107, 114 (7th Cir. 1989)); *see also Presbitero*, 569 F.3d at 706. The Court addresses common arguments together where possible in this discussion.

### A. There Was No Speedy Trial Act Violation

Nichols claims without elaborating that the Court erred in denying his pretrial motions to dismiss the indictment on speedy trial grounds. *See* (Dkt. 279) at (1)(b). Each time Nichols argued that the Speedy Trial Act was violated, the Court considered his motion and denied it. *See* (Dkts. 123, 192, 226, 252); *see also* (Dkt. 298) (12/21/17 Hearing), (Dkt. 199) (1/8/18 Hearing), (Dkt. 212) (2/1/18 Hearing). In his motion, Nichols specifically points to motions he filed on May 11, 2017 (Dkt. 142), February 1, 2018 (Dkt. 211), and March 12, 2018 (Dkt. 247) as wrongly decided.[8]

The Sixth Amendment to the Constitution provides that "in all criminal prosecutions, the accused shall enjoy the right to a speedy . . . trial." The Supreme Court has held that the so-called

---

[8] The May 11, 2017 motion requests appointment of new counsel; it does not challenge the timing of the indictment aside from complaining about statements and case citations that Mr. Graham included in a pretrial motion concerning speedy trial violations. *See* (Dkt. 142); *see also* (Dkt. 91) (Motions Regarding Speedy Trial Violations). The February 1, 2018 motion similarly regards representation-related relief in that it sought to supplement Nichols's motion for reconsideration of the denial of his motion for appointment of new counsel. *See* (Dkt. 211). This motion does contain arguments about the Speedy Trial Act issue as it is largely based on Mr. Graham's handling of the issue. *Id.* at 1–3. In any event, the propriety of the Court's ruling on Nichols's representation motions is discussed elsewhere in this opinion, but obviously, they do not serve as a basis for the Court to revisit its prior rulings on Nichols's Speedy Trial Act claims. So the only wrongly decided motion regarding the Speedy Trial Act that Nichols points to specifically is the March 12, 2018 motion (Dkt. 247), although the Court will consider those speedy trial arguments contained in the February 1, 2018 motion (Dkt. 211) as well.

speedy trial clock does not begin to tick "before a defendant is indicted, arrested, or otherwise officially accused." *United States v. MacDonald*, 456 U.S. 1, 6 (1982). The government may file charges by filing a criminal complaint based upon the affidavit of a law enforcement officer. Fed. R. Crim. P. 3. When the charge is brought by a law enforcement officer as the complainant, the federal prosecutor must indict the case within 30 days or seek an extension of time to file the indictment from the Chief Judge. 18 U.S.C. § 3161(b); *see also* N.D. Ill. L. Cr. R. 6.1. If the federal prosecutor does not seek an indictment from the grand jury within 30 days, the complaint is dismissed. 18 U.S.C. § 3162(a); Fed. R. Crim. P. 48(b)(1). This 30-day period from complaint to indictment begins to run "from the date on which such individual was arrested or served with a summons in connection with such charges," which in this matter means the moment Nichols was taken into federal custody, 18 U.S.C. § 3161(b), and not from the date that the complaint was filed on the docket. *See United States v. Clark*, 754 F.3d 401, 405–07 (7th Cir. 2014).

Specifically, Nichols was charged in a criminal complaint filed on December 29, 2015 in the Northern District of Illinois with sex trafficking of Individual C by force, fraud, or coercion in violation of the TVPA. (Dkt. 1). An arrest warrant was issued the same day. (Dkt. 5). At that time, Nichols was incarcerated on unrelated state charges in Tennessee; he was not in the custody of federal agents. On January 5, 2016, federal agents took Nichols into custody in Tennessee. (Dkt. Entry 1/5/16) ("ARREST of defendant Samuel Nichols in the Western District of Tennessee."); *see* (Dkt. 7) at 47 (executed arrest warrant); (Dkt. 40); *see also* Tr. at 1539 (Nichols testified that he was convicted of domestic battery in 2015 (regarding Candace) and sentenced to one year in prison). After his initial appearance in the Western District of Tennessee on January 5, Nichols was transported to the Northern District of Illinois. On February 3, 2016, a federal grand jury indicted Nichols on charges of sex trafficking of Individual C, Individual A, and Minor

A.  *See* (Dkt. 21).  Therefore, the indictment was returned 29 days after Nichols was arrested on this matter—within the applicable 30-day time period under § 3161(b).  The Superseding Indictment came down two months later.

Nichols previously argued that the 30-day clock began to run on December 29, 2015 because the issuance of the arrest warrant and filing of the "criminal complaint constitutes as a summons served in connection with the charges."  *See* (Dkt. 211) at 1–2; (Dkt. 247) at 2.  Not only is Nichols's assertion wholly unsupported by any authority, it is not a tenable interpretation of the statute.  A complaint is not a summons, and the filing of a complaint with the Court cannot constitute *service* of a summons (or even of the complaint itself).  Nichols's argument would render the language of the statute meaningless and would have the clock start running at the time any criminal complaint is filed.  Again, that is not what the statute dictates, and such faulty logic particularly is inapplicable where the criminal complaint charges a felony as it did here.  Although a criminal complaint can initiate a misdemeanor prosecution, a "complaint that charges a felony can establish a basis for an arrest warrant, justify an arrest made without a warrant, initiate, continue, or expand an investigation, and notify other law enforcement agencies of its concern with the person arrested or investigated."  *United States v. Richardson*, 780 F.3d 812, 814 (7th Cir. 2015) (citations omitted).  That is, a criminal complaint that charges a felony signifies an investigation rather than a prosecution.  *Id*.  Therefore, the filing of the criminal complaint did not constitute an event in which Nichols was "otherwise officially accused" of a federal felony so as to start the speedy trial clock.  *MacDonald*, 456 U.S. at 6.

In fact, the Seventh Circuit has already considered and rejected a similar argument that the speedy trial clock started with the filing of a federal complaint and a detainer with a sheriff.  In *United States v. Clark*, the appellate court made clear that "[t]he *sine qua non* of an arrest for

purposes of the [Speedy Trial] Act is the act of unambiguously bringing the accused into federal custody." 754 F.3d at 407. In other words, a "'federal deprivation of liberty' is required to start the 30–day period under the Speedy Trial Act." *Id*. For this reason, to the extent that Nichols has raised any argument that he was arrested on a date before January 5, 2016 because he was already in custody on state charges, this too fails because the record clearly indicates that he was not brought into *federal* custody until January 5, 2016. *See* (Dkt. 40) (returned arrest warrant); (Dkt. 211) at 6 (Fax Transmission from Shelby County, Tennessee Sheriff's Office noting that Nichols was in custody at the Shelby County Jail from April 27, 2015 to January 5, 2016); *see also Richardson*, 780 F.3d at 815 ("[t]he relevant arrest (that is, one followed by detention) must be for a suspected federal crime, and there was no federal arrest when he was arrested on state charges"). Because neither the filing of the complaint, the issuance of the arrest warrant, or the April 2015 arrest on state charges initiated federal custody, Nichols's speedy trial clock did not begin to run until his federal arrest on the charges brought in this matter on January 5, 2016. He was indicted 29 days later and thus, there was no violation of the Act.

### B.     Counsel Issues

Next, Nichols argues that the Court erred in denying his motions for appointment of new counsel. (Dkt. 279) at (1)(a). Like his argument that his speedy-trial motions were erroneously denied, Nichols rests on "the arguments and law cited in these motions and incorporates by reference[] that language in these pleading[s]" as well as the arguments advanced in open court. *Id*. at 3. However, even in the criminal context, perfunctory and undeveloped arguments, unsupported by pertinent authority, are waived and warrant no discussion (even where those arguments raise constitutional issues); courts are not obligated "to research and construct the legal arguments open to parties, especially when they are represented by counsel." *United States v.*

*Holm*, 326 F.3d 872, 877 (7th Cir. 2003) (quotations and citations omitted); *accord United States v. Cisneros*, 846 F.3d 972, 978 (7th Cir. 2017) (claim waived where defendant failed to develop law and underlying facts); *United States v. Alden*, 527 F.3d 653, 664 (7th Cir. 2008); *United States v. McLee*, 436 F.3d 751, 760 (7th Cir. 2006) (argument was "woefully underdeveloped" where defendant argued court admitted hearsay statements but failed to identify such statements).

In any event, to summarize the issue, Nichols was entitled to attorney representation to defend the charges brought against him. *See United States v. Irorere*, 228 F.3d 816, 826 (7th Cir. 2000). After appointing one attorney, the Court appointed co-counsel due to the complexity of the charges and the severity of the potential penalty upon conviction. (Dkts. 81, 83). Yet after counsel's unsuccessful attempt to dismiss the indictment based on speedy trial violations in a motion that they filed at his request but that also explained the lack of supporting legal authority for the argument (Dkt. 91), Nichols stopped working with his attorneys. In fact, he asserted on numerous occasions that he could not work with attorneys who did not support his position – a position not supported by the law. *See, e.g.*, (Dkts. 129, 142, 211, 213).

After Nichols filed the first of these motions in March 2017, the Court held hearings on March 21 and April 12, 2017. *See* (Dkt. 296) (3/21/17 Hearing Tr.); (Dkt. 297) (4/12/17 Hearing Tr.). Between these hearings, counsel met with Nichols to work out his concerns. On April 12, 2017, however, Nichols made clear that he would not relent and insisted on substitute counsel. Nichols based his position on his disagreement with the manner in which counsel presented his speedy-trial motion, which Nichols viewed as helpful to the government in that it supplied accurate caselaw to the Court, and his feeling that no progress was being made on his case. Ultimately, Nichols said that he did not feel that it was in his best interest to stick with his counsel. *See* (Dkt. 297) at 5–8. After hearing Nichols's arguments, the Court explained that his appointed counsel

have an independent ethical obligation not to bring motions in bad faith or to present a false statement of fact or law to the Court. The Court also explained to Nichols that while he had a right to counsel, he did not have a right to be appointed the counsel of his choice (although he was free to hire an attorney of his choosing). So with regard to appointed counsel, he could either work with counsel or choose to proceed *pro se*. After his continued refusal to work with counsel, the Court denied his request for new counsel but granted the attorneys' motion to withdraw due to irreconcilable differences, ordering that they stay on as stand-by counsel and that they continue trial preparations. *See id.* at 10–12. The Court warned Nichols that it was not in his best interest to proceed *pro se*—a warning the Court repeated to Nichols at each subsequent status hearing. In addition, the Court again thoroughly explored Nichols's issues with counsel and also questioned him about his legal and educational history at subsequent hearings. (Dkt. 298) (12/21/17 Hearing Tr.) at 8–47; *see also* (Dkt. 199) (1/8/18 Hearing); (Dkt. 212) (2/1/18 Hearing).

During this same time, because of Nichols's desire to continue to fight the indictment on speedy-trial grounds, the Court exhaustively explained to Nichols that his claim was without merit for the reasons laid out above and allowed him to seek additional records from the Tennessee jail to demonstrate the flaw in his claim. Nevertheless, Nichols adamantly refused to accept the rulings and to work with counsel. In requesting new counsel, he claimed to have a conflict of interest with his appointed lawyers due to the fact that they had filed the motion to dismiss the indictment with the correct caselaw.

A district court abuses its discretion in denying a motion to substitute counsel "only if there exists a demonstrable conflict of interest or if counsel and defendant are so at odds as to prevent presentation of an adequate defense." *United States v. Horton*, 845 F.2d 1414, 1417–18 (7th Cir. 1988) (citation omitted). As already described, the Court inquired into the basis for Nichols's

substitution motions and he made clear that they were based on the way counsel dealt with his speedy-trial issue and his resultant feeling that they were not working in his best interests. But the Court explained to Nichols that his speedy-trial argument was meritless (*see* (Dkt. 226) ("Of course, there is no attorney who could represent Nichols and present his flawed position to the Court as he wishes because his position is not supported by the law.")), and counsel repeatedly affirmed that they were willing and ready to assist Nichols in the presentation of an adequate defense. Nichols's disagreement with counsel did not constitute a conflict. *See, e.g.*, *Hall v. United States*, 371 F.3d 969, 973 (7th Cir. 2004) ("[A]n actual conflict exists if the defense counsel was faced with a choice between advancing his own interests above those of his client."); *Lipson v. United States*, 233 F.3d 942, 946 (7th Cir. 2000) (recognizing actual conflict where attorney allows a client's co-defendant to dictate the client's legal defense because he is paying the client's legal fees). "[D]enial of a motion to substitute alleging only 'ethereal distrust' of counsel is not reversible error." *Horton*, 845 F.2d at 1418 (*United States v. Morris*, 714 F.2d 669, 673 (7th Cir. 1983)). "Nor do 'personality conflicts and disagreements over trial strategy' constitute grounds for reversible error." *Id.* (quoting *United States v. Hillsberg*, 812 F.2d 328, 333–34 (7th Cir. 1987), and affirming court's denial of motion to substitute counsel based on finding that "communication barrier" between defense counsel and defendant was merely the result of defendant's refusal to cooperate with defense counsel). It was clear that the alleged conflict here concerned only strategy decisions and a general feeling of distrust and therefore was not a valid conflict; it was frivolous. *See id.* at 1421 ("It is no deficiency of defendant's counsel that he did not file unnecessary motions of some sort to satisfy Horton.").

Further, the Court's inquiries of Nichols and appointed counsel indicated that although they disagreed on how the speedy-trial motion was handled, they were not so at odds as to prevent

presentation of an adequate defense. To be sure, Nichols refused to meet with counsel at times, but other times he accepted and followed their advice. Counsel repeatedly represented (and demonstrated) to the Court that they were prepared to proceed to trial and during dozens of status hearings counsel apprised the Court of the intense work they were engaged in to prepare for trial. Thus, denial of the motions for substitute counsel was appropriate. *See United States v. Thomas*, 833 F.3d 785, 793 (7th Cir. 2016) (denial of request for new counsel was not abuse of discretion where defendant refused to meet or cooperate with fourth appointed attorney); *United States v. Volpentesta*, 727 F.3d 666, 673–74 (7th Cir. 2013) (denial of request for new counsel was not abuse of discretion; "arguments over trial strategy (which likely developed into personality conflicts over time as well), . . . do not constitute grounds for substitution of counsel").

The necessary consequence of a court's denial of a request to substitute counsel "is that the defendant must choose whether to (1) continue with appointed counsel, (2) retain counsel, or (3) proceed *pro se*." *Thomas*, 833 F.3d at 792. Here, through his refusal to work with counsel, his belligerent and obstructive behavior, his motions and in court arguments, and his efforts to delay the trial, the Court found that Nichols had constructively discharged his attorneys. *See* (Dkt. 192); (Dkt. 226) at 7–11; (Dkt. 297) at 11; (Dkt. 298) at 37–47. To the extent that Nichols challenges this finding, it was not error. *See Irorere*, 228 F.3d 816, 826 ("a defendant may waive his right to counsel through his own contumacious conduct") (citing *United States v. Fazzini*, 871 F.2d 635, 642 (7th Cir. 1989)); *see also United States v. Jones*, 844 F.3d 636, 644 (7th Cir. 2016) (where defendant exhibited a "pattern of delay and obstruction, the district judge did not abuse her discretion in denying [his] request for appointment of yet another lawyer"); *Volpentesta*, 727 F.3d 666, 678 (7th Cir. 2013) (defendant's waiver "was a strategic decision he made so that he could pursue the case as he desired").

The Court addressed the difficulties of proceeding *pro se* with Nichols on numerous occasions and explored at length his background and experience with the legal system. *See, e.g.*, (Dkts. 297, 298). In spite of these warnings, Nichols refused to work with his appointed counsel. As such, the record clearly reflects that Nichols's waiver of counsel was knowing and intelligent. *See Faretta v. California*, 422 U.S. 806, 835 (1975) (in order to represent himself, the accused must knowingly and intelligently forgo those relinquished benefits) (citations and quotations omitted); *United States v. Balsiger*, 910 F.3d 942, 953 (7th Cir. 2018) (considering the background and experience of the defendant, the context of his decision, whether the district court conducted a formal hearing and any other evidence establishes the defendant understood the dangers and disadvantages of proceeding *pro se*); *accord Volpentesta*, 727 F.3d at 677. Indeed, the Court gave Nichols sufficient opportunity to retain the assistance of appointed counsel; his actions depriving himself of counsel establish a knowing and intentional choice. *Irorere*, 228 F.3d at 828 (citing *Fazzini*, 871 F.2d at 642); *United States v. Murphy*, 469 F.3d 1130, 1136 (7th Cir. 2006) ("a defendant can waive his right to counsel through conduct as well as words."); *United States v. Harris*, 2 F.3d 1452, 1455 (7th Cir. 1993) (finding voluntary and informed waiver where the defendant refused to cooperate with his lawyers and was told that no substitute counsel would be appointed for him). Like the defendant in *Balsiger*, the record here shows that in addition to the Court's explicit warnings, Nichols's conduct demonstrated that he "sufficiently appreciated the risks of going it alone" "as he repeatedly asserted he was not waiving his right to counsel and relied on standby counsel during trial." 910 F.3d at 954; *see United States v. Hoskins*, 243 F.3d 407, 409 (7th Cir. 2001) (upholding waiver where district court advised defendant that he "would be far better off being defended by a trained lawyer and that it would be 'unwise' to defend himself because of the complexity of the legal issues involved"). All in all, Nichols made deliberate

decisions regarding his representation, which were based on his desire to continue to pursue dismissal of the indictment on speedy-trial grounds. "A waiver is likely knowing and voluntary if the defendant gave it for strategic reasons or after repeatedly rejecting the assistance of counsel." *United States v. England*, 507 F.3d 581, 588 (7th Cir. 2007); *see also United States v. Banks*, 828 F.3d 609, 614–16 (7th Cir. 2016); *Volpentesta*, 727 F.3d at 678.

As a final point, although Nichols refused to accept the Court's ruling on his speedy-trial motions and correspondingly refused to work with counsel to prepare for trial, counsel continued to provide him competent services to the best of their ability and whenever Nichols asked or needed them to step in. For example, counsel requested an initial competency examination and then a second by an individual of their selection. They represented Nichols at the March 1, 2018 competency hearing and briefed the issue. In addition, counsel was present at trial and assisted Nichols throughout, at times playing significant roles, such as conducting proceedings during Nichols's brief absences (*voir dire* and cross examination of Dr. Cooper), arguing the motion for dismissal of the indictment, and assisting with the jury instruction conference. Counsel also provided frequent advice and assistance to Nichols in real time. *See, e.g.*, Tr. at 755 ("THE COURT: Okay. What is your reason for showing it? THE DEFENDANT: Help. MS. WINSLOW: To show that she is, in fact, not a law-abiding citizen . . . ."); *id.* at 738 ("Let the record also reflect that for the last three days, you've been doing very well, communicating with [Ms. Winslow] regularly, using questions that she has drafted, stopping in the middle—"); *see generally id.* (reflecting countless instances where Nichols conferred with stand-by counsel). The record is replete with instances where Nichols turned and consulted with his standby counsel sometimes for many minutes at a time before continuing with his own performance. In his closing argument, Nichols acknowledged the efforts of stand-by counsel by stating on the record: "I would like to

thank my lawyers who have been very patient with me and clearly have my best interest at heart, even though I was mean to them in the beginning." *Id*. at 1766.

In sum, having failed to set forth any new reasoning as to why the decisions on this issue merit further reconsideration and based on the Court's consideration of the record, the Court finds no error in its prior rulings.

### C.    Nichols Was Competent to Stand Trial

Regarding his competence, Nichols first generally challenges the Court's finding after the March 1, 2018 competency hearing, which involved the testimony of two different psychologists who evaluated Nichols. *See* (Dkt. 279) at (1)(d).  By way of background, after Nichols requested a mental health evaluation, the Court granted the motion on August 30, 2017 (Dkt. 173); a doctor from the Isaac Ray Forensic Group was selected.  (Dkt. 176).  On December 10, 2017, Dr. Diana Goldstein submitted the ordered report, which indicated that Nichols was competent to stand trial. (Dkt. 194).  The Court thereafter granted Nichols's motion for a second evaluation and on February 12, 2018, Nichols's chosen evaluator, Dr. Michael Fields, submitted a report to the Court, wherein he found that Nichols was not competent to stand trial due to his lack of capacity to conform himself to many of the expectations of the trial process.

The Court held a competency hearing on March 1, 2018 and both psychologists testified and were cross examined.  To summarize, Dr. Goldstein, a neuropsychologist, testified that she met with Nichols on two occasions for a total of about 13 hours and performed both cognitive and psychological testing in addition to gathering his background information and conducting a competency interview. *See* (Dkt. 310) at 17.  Dr. Goldstein concluded that Nichols had personality disorders, learning disorders, and other developmental disorders, but that he did not have any major mental disorder or serious psychiatric problem. *Id*. at 38.  She testified that Nichols's disorders

were "behavioral problems, and they're under his control," so there was "nothing from a cognitive standpoint or psychiatric standpoint in [her] opinion that is affecting is capacity, his ability to work meaningfully with his attorneys or any with any attorney if he wants to toward a defense." *Id*. at 42. Speaking to Nichols's refusal to work with counsel, Dr. Goldstein testified "this is willful, he's angry, and he is choosing not to work with his attorneys." *Id*. On the other hand, Dr. Fields, a clinical and forensic psychologist, testified that he spoke with Nichols for about one and a half hours and discussed his background and the charges pending against him but was not able to administer any cognitive tests. *Id*. at 63–64. Based on their interactions, Dr. Fields concluded that Nichols was emotionally unstable and unable to comport himself effectively, and therefore he was not competent to stand trial. *Id*. at 72. Ultimately, after considering both reports, the testimony, other hearing evidence presented including jail calls involving Nichols (which indicated that Nichols's issues with counsel and competence challenges were "strategy and a delay tactic"), and Nichols's cooperative behavior during the competency hearing, the Court discredited Dr. Fields's report and found Nichols competent to stand trial and to represent himself. *See id*. at 94–101. Nichols generally argues that this was an error. (Dkt. 279) at 3.

Whether a defendant is competent depends on whether he "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and whether he has a rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402, 402 (1960); *see* 18 U.S.C. § 4241(d). Absent specific evidence to the contrary, "there is a presumption that a criminal defendant is mentally competent to stand trial." *United States v. Teague*, 956 F.2d 1427, 1431 (7th Cir. 1992) (quoting *Chichakly v. United States*, 926 F.2d 624, 633 (7th Cir. 1991)). On this point, Nichols does not make any specific arguments of error in the Court's finding of competence after the hearing. He also does not cite any case law to

support his position that the Court was incorrect in finding him competent to stand trial. Therefore, the Court sees no reason to further reconsider its ruling—based on both expert testimony, Nichols's statements, and the Court's own observations—that Nichols was competent under the *Dusky* standard. *See* (Dkt. 310) at 94–101 (among other things, accepting Dr. Goldstein's conclusion that although Nichols had documented personality disorders, he did not suffer from any mental disease or defect; discrediting Dr. Field's evaluation for using an improper standard and not actually testing Nichols; finding that Nichols was very much aware that he was facing serious charges, he was aware of the elements of the charges, and he had formulated certain defenses; and noting that Nichols was able to comport himself to courtroom behavior and cooperate with stand-by counsel during the hearing); *e.g.*, *United States v. Segal*, 398 F. Supp. 2d 912, 916 (N.D. Ill. 2005) (factors that the court may consider include testimony from psychiatrists, the defendant's behavior—both before the court and elsewhere—intelligence, lapses of memory, unresponsiveness and defense counsel's observations).

Nichols suggests, however, that even if he was competent to stand trial, he was not competent to represent himself during the proceedings. *See* (Dkt. 279) at (1)(c). This is because he has little formal education, reads at a remedial level, previously was diagnosed with attention deficit disorder and required medication, and could not keep up with the voluminous discovery in the matter. *Id*. at 2. Although Nichols concedes that the Court held at least two hearings to determine his ability to represent himself, he argues that his conduct at trial demonstrated that he "clearly was not capable of acting as his own counsel." *Id*. He further argues that he was incapable of representing himself because of certain medications he took during the first few days of trial which caused extreme drowsiness, impeded his ability to focus, and made him more agitated and jumpy. (Dkt. 294) at 1–2. These arguments, however, are without merit. "The Constitution does

not create two standards for competence—one for standing trial and the other for self-representation." *United States v. Anzaldi*, 800 F.3d 872, 879 (7th Cir. 2015). Thus, the Court did not err in finding Nichols competent for the reasons already explained above.

For what it is worth, Nichols arguments here do not in any way undermine the Court's conclusion that he was competent. In fact, many of these arguments are belied by the record. For example, the record indicates that although his educational experiences were less than stable, Nichols is a high school graduate. *See* (Dkt. 298) at 11–12. Second, he relayed to the Court that he has significant criminal experience, having been a defendant in at least nine other criminal matters in state court (represented by counsel), at least one of which went to trial. *Id*. at 13–14. Third, he unequivocally told the Court, "I know how to read." *Id*. at 25. Through the course of this discussion, Nichols indicated that he could understand many of the legal issues that he came in contact with. *See id*. at 35 ("Me reading and me understanding, that will help me."). Although Dr. Goldstein testified that Nichols reads at a fifth-grade level and lacks school-learned information and some attentional skills, she testified that he does very well in non-verbal problem solving and abstract reasoning. *See* (Dkt. 310) at 32.

Nichols's trial behavior further demonstrated his competence. First, he effectively cross-examined various witnesses. Generally, the Court noted "Mr. Nichols has very effectively crossed about the personal relationships that he's had with many of these individuals who are working for him . . . ." Tr. at 1464. In particular, he effectively cross examined Jameela regarding a gun in a rap video, discussed below. *Id*. at 1467 (the prosecutor noted that "he was able to effectively cross-examine the witness about her improper recollection of what the video showed."). In addition, the Court noted that "[h]e used [the medical records] effectively to cross the [hospital] records

custodian" about Michelle's injuries, also discussed below. *Id*. at 1473. Also regarding Michelle, the Court noted that Nichols had "effectively used" the jail call to impeach her. *Id*. at 1712.

Second, Nichols made several objections throughout trial that were sustained. Third, Nichols asserted various defense theories throughout the proceedings, such as the theory that he never forced the women and girls to prostitute themselves, the violence discussed at trial was personal or domestic in nature and not related to the trafficking, and that he had no knowledge or reason to know that anyone who worked for him was a minor. Significantly, the jury accepted his last argument, finding only that Nichols knew or recklessly disregarded that force, threats of force, or coercion would cause Minor A to engage in a commercial sex act, and not that he knew or recklessly disregarded the fact that she was under 18 years of age. *See* (Dkt. 267) at 2. These themes were reflected in Nichols's opening statement and closing argument. These examples demonstrate that Nichols actively and at times successfully participated in his defense and they further support the Court's competency determination. *See Anzaldi*, 800 F.3d at 879 (*pro se* defendant who actively participated in defense at trial and advanced nuanced legal arguments, such as arguments attempting to negate an element of her crime, reflected an in-depth understanding of the charges against her and demonstrated her competence); *United States v. Berry*, 565 F.3d 385, 389 (7th Cir. 2009) (*pro se* defendant's performance—lodging objections, cross-examining witnesses, and making opening and closing statements—demonstrated mental competence).

Finally, the Court has already addressed the issue of Nichols's self-driven over-medication before and at the start of trial and its effect on the Court's competency ruling. *See* (Dkt. 319). Seeing that Nichols asserts the same arguments here, the Court stands on its prior conclusion that "in light of the two competency evaluations, the March competency hearing, the Court's investigation of Nichols's medications, the Court's on-the-record discussions with Nichols

regarding his medication, and the revisions to Nichols's medication administration at the start of trial—combined with the Court's observation of Nichols's behavior throughout his criminal proceedings as a whole—Nichols has not carried his burden of demonstrating reasonable cause to believe that he was incompetent at trial." *Id*. at 5.

Specifically, jury selection began on the morning of March 12, 2018. After the Court described the case, the prospective jurors were placed under oath and questioned individually in groups of 14. *See* (Dkt. 288) ("*Voir Dire* Tr.") at 17. While the Court was questioning the fourth prospective juror out of the first group of 14, "Nichols was leaning back with his eyes closed, apparently sleeping." *Id.* at 63. This is when Nichols first mentioned the issue of medication and drowsiness. *Id*. at 57, 63. Accordingly, the Court conducted questioning at sidebar to allow Nichols to "stand up and wake up." *Id*. at 63. But Nichols began to act out and become disrespectful to the Court and proceedings generally. *See, e.g*., *id*. at 66 ("THE DEFENDANT: Why don't you strike myself? I'm tired of this. I don't—why am I still even here?"). The questioning continued and shortly thereafter the trial broke for a 45-minute lunch break. Returning around 1:30 p.m., the Court continued to question the first 14 jurors. At one point, Nichols flippantly asked what the purpose of the questioning was and after the Court explained the jury selection process, he asked if he could "just leave." *Id*. at 125–26; *see also id*. at 126 ("THE DEFENDANT: I don't want to be here no more. I'm not sitting through this. You all sitting here telling these people basically I'm a fucking monster. I don't want to sit here and listen to this. I want to leave. That's what I want to do."); *id*. at 127 ("THE DEFENDANT: I don't care about nothing you told me. I'm ready to go."). Eventually, Nichols had profanity-filled outburst in front of the prospective jurors and he was removed from the courtroom. *Id*. at 128. Nichols was taken to a neighboring courtroom with one stand-by attorney, where a live closed-circuit video feed of

the proceedings was available to him. His other stand-by counsel remained in the courtroom to participate in *voir dire*.

Outside of the presence of the potential jurors the next morning, March 13, Nichols expressed his desire to participate in trial and the Court explained the jury selection process and courtroom rules. Tr. at 86–101. In addition, the Court discussed information about Nichols's medications that it received from the Metropolitan Correctional Center where Nichols was detained, since Nichols was unable to provide those details the previous day. Jail counsel and a pharmacist reported that Nichols had been prescribed an anti-inflammatory medication and two anti-depressants but that the anti-depressants had been discontinued. Nichols disputed the accuracy of that report, so the Court re-inquired. *Id*. at 105–08. Regardless of the dispute, Nichols represented that he had not taken his medication that morning so he would not be sleepy. *Id*. at 302; *Voir Dire* Tr. at 324. Nichols participated in jury selection without any incident. In fact, as is described in further detail below, the Court even allowed Nichols to question at sidebar all of the jurors who had been questioned on March 12 after he was removed from the courtroom who had not been stricken for cause and released. In addition, before the jurors were selected the Court asked one final question of the panel:

> Okay, folks. As you can see, Mr. Nichols is cooperating with the trial process today, but I do need to make sure that yesterday's behavior did not impact the way you look at him as a defendant. I want to make sure that everyone still presumes him to be innocent, and that you will hold the government to their burden of proof. Is there anyone here that, after observing yesterday's behavior, believes that they have—that is not the case, that they can't give him the presumption of innocence? If so, please raise your hand now.

*Id*. at 339. No potential juror responded affirmatively. After lunch, Nichols gave an opening statement, which previewed his defense theories. However, when the government called its first witness (Dr. Cooper) around 2:30 p.m., Nichols interrupted: "I want to go. Hey, your Honor, I'm ready. Get me the fuck up out of here. I'm ready to go. I can't do this. I'm not going to be able

to do it." Tr. at 191. After this, Nichols was removed to the satellite courtroom for the remainder of the day, which involved Dr. Cooper's testimony.

Another report from the jail was discussed the following morning, indicating that Nichols's anti-depressants were supposed to be increased, not discontinued. *Id.* at 302. Accordingly, the Court reported that increased dosages of those medications would be prescribed and administered during the pill line—to track compliance—and in the evenings—to address any possible, but unlikely, sedation issues—with the exception of one of the medications which required a morning and evening dosage. *Id.* at 302–03. Nichols did not report drowsiness or any other issues for the remainder of trial. As the timeline of events reflects, the Court immediately took appropriate measures to address Nichols's sleepiness and medication-related issues during the first trial day. Moreover, the Court gave Nichols the opportunity to question prospective jurors from the previous day and ensured that Nichols's behavior had not prejudiced any of the prospective jurors, meaning that Nichols did not suffer any prejudice on account of the proceedings on the first day. In addition, neither Nichols's initial drowsiness nor his outbursts during the first two days of trial are cause to disturb the Court's earlier competence conclusion, especially where the administration of his anti-depressants and other medication was modified and Nichols did not experience any further episodes and he was not again removed from the courtroom. *See Woods v. McBride*, 430 F.3d 813, 818–20 (7th Cir. 2005) (defendant's medication-induced drowsiness during jury selection did not upend earlier competence finding); *see also United States v. Savage*, 505 F.3d 754, 759–60 (7th Cir. 2007). Indeed, during the remaining eight trial days, Nichols ably conducted the cross-examination of twelve witnesses with vigor and alertness for hours, he took the stand and testified in his own defense, and he presented a lengthy closing argument. Overall, the Court did not err in

finding Nichols competent and his behavior during trial did not provide reason to believe that the finding was no longer accurate. Nichols's motion for new trial is denied on this ground.

### D.      Juror 17

Nichols next claims that he knew one of the jurors and that therefore the Court erred in allowing that individual to serve on the jury. (Dkt. 279) at (1)(e). In particular, Nichols argues that Juror 17 worked as a security guard at a placement home and school where Nichols resided as a minor. On account of their shared history, Nichols argues that Juror 17 may not have been able to be fair and impartial. *Id*. at 3. Nichols did not raise this issue during *voir dire* or at any time during trial, nor did he move to strike Juror 17 during the proceedings. In fact, the first time the issue was brought to the Court's attention was nearly three months after trial in his Motion for Judgment of Acquittal Notwithstanding the Verdict or, Alternatively, for New Trial. (Dkt. 279). Counsel for Nichols mentioned the issue at a status hearing on June 28, 2018, stating that the presence of Juror 17 "was a big distraction during the course of the trial because he was abused in that home, and that employee was working there at the time." (Dkt. 292).

At the start of jury selection, the Court introduced Nichols and his stand-by counsel to the entire panel of prospective jurors. The Court asked, "Do any of you know any of the people that I just introduced to you? If so, raise your hand." *Voir Dire* Tr. at 9. There was no affirmative response from any prospective juror. *Id*. The Court proceeded to question the prospective jurors individually; as described above, Nichols's behavior caused him to be removed from the courtroom in the early afternoon, while the Court was still questioning the first group of 14 prospective jurors. In Nichols's absence, stand-by counsel conducted *voir dire* and eventually a second group of 14 prospective jurors (Jurors 15 through 28) were placed in the jury box for individual questioning. As relevant to Nichols's present objection, Juror 17 told the Court that he

is and has long been a security guard who was at one time was deputized to act as an officer by the Chicago Police Department when he was working for Catholic Charities at an Englewood "group home for wards of the state and things like that." *Id*. at 152. After going through additional questioning, Juror 17 confirmed that he could listen to the evidence, keep an open mind, and wait until the end of trial to decide on guilt or innocence. *Id*. at 152–57. The Court concluded its questioning of this second panel of 14 jurors and moved on to a third panel late in the day on March 12. *Id*. at 228.

The second day of jury selection resumed with the questioning of the third panel of 14 prospective jurors and with Nichols's participation. He engaged in questioning the prospective jurors including those who had been questioned in his absence the previous day. Regarding Juror 17, Nichols asked him where he worked and if he had ever worked with children. Juror 17 replied that he had worked with children at "Solace Place on the south side, Englewood, 63rd and Sangamon." *Id*. at 332. Nichols asked, "The school? The group home?" Juror 17 replied, "Yeah." *Id*. Nichols then asked if Juror 17 would "be able to give [him] a fair trial," to which Juror 17 replied, "Yeah." *Id*. Nichols did not have any additional questions for Juror 17, who was excused from the sidebar after this exchange.

After Nichols finished his questioning, the Court explained:

So then you have had an opportunity to be here present for the first 12 to ask questions of the second—I'm sorry, the first 14, to ask questions of the second 14, and the third 14. And we have enough, if you take your ten strikes and their six, to get our jury, but then we have to come back and ask more questions for alternates, okay?

*Id*. at 337. The Court again explained that Nichols had ten strikes to use to eliminate ten people he did not want from those under consideration. *Id*. at 338. The parties applied their strikes and returned them to the Court. The Court noted that Nichols had only used nine of his ten allotted strikes; he opted not to use his final strike. *Id*. at 340–41. As a result of this process, Juror 17 was

not stricken by either party and he was selected as the seventh sitting juror on a panel of 12. Three alternates also were selected.

The government first correctly argues that by failing to alert the Court during trial that he may have known Juror 17 or Juror 17's possible bias, Nichols waived this claim. "Waiver is the intentional relinquishment of a known right" and precludes judicial review by extinguishing the error. *United States v. Butler*, 777 F.3d 382, 387 (7th Cir. 2015) (citing *United States v. Olano*, 507 U.S. 725, 733 (1993)). Forfeiture, on the other hand, "is the failure to make the timely assertion of a right . . . by accident or neglect." *Id.* (citing *Olano*, 507 U.S. at 733); *see also United States v. Pappas*, 409 F.3d 828, 829 (7th Cir. 2005) ("Waiver and forfeiture are related doctrines; waiver occurs when a defendant intentionally relinquishes or abandons a known right, whereas forfeiture occurs when a defendant fails to timely assert his rights.") (quotations and citations omitted). "A forfeiture is basically an oversight; a waiver is a deliberate decision not to present a ground for relief that might be available in the law." *United States v. Cook*, 406 F.3d 485, 487 (7th Cir. 2005) (citations omitted).

Nichols was present on the first day of jury selection until the early afternoon and on the second day. For the portion of jury selection during which Nichols was not present in the courtroom, he had a closed-circuit feed of the selection proceedings available to him. Although he was not physically present in the room when Juror 17 was questioned initially by the Court, Nichols was given the opportunity to question Juror 17 at sidebar the next day, and when he did, Juror 17 disclosed that he had been a security guard at Solace Place in Englewood. Nichols appeared to recognize the location, asking if the juror was referring to the school or group home. Even after the juror confirmed the reference, Nichols simply asked if the juror would be able to give him a fair trial. He did not raise the issue of his own placement at Solace Place or his potential

recognition of Juror 17. Not only that, he chose not to use any of his ten preemptory strikes on Juror 17. In addition to these interactions and opportunities during the selection process, in spite of being given a primer by the Court on how he could use his strikes and in spite of discussing his strikes with standby counsel. Nichols heard the juror's name repeatedly and he had the opportunity the eleven trial days to recognize the juror. At some point, Nichols claims that he recognized the juror, because he has since represented that the juror's presence was distracting. Yet, it is undisputed that neither he nor his stand-by counsel raised any issue about this juror during trial. Nor has Nichols even attempted to offer an explanation for not raising his issues with Juror 17 during jury selection or trial. Nothing in the record reflects that Nichols was housed in Solace House during the time that Jury 17 worked there and nothing in the record shows any link between Nichols and Juror 17. On these facts, it is difficult to comprehend how Nichols's failure to timely raise the issue could have been due to accident or neglect. Instead, Nichols appears to have decided not to raise the issue during trial for whatever reason. *See United States v. Gootee*, 34 F.3d 475, 479 (7th Cir. 1994) (claim of possible juror misconduct on account of foreman's possession of a legal publication was waived when it was not brought to the court's attention until after the jury was dismissed and defendant sentenced); *see, e.g.*, *United States v. Cephus*, 2015 WL 470450, at *11 (N.D. Ind. Feb. 4, 2015) ("By not bringing his alleged knowledge of this possible juror bias to the attention of this Court before the verdict, the Court believes Cephus has waived his right to a new trial.").

Even if not waived, Nichols's claim fails. The requirement of an impartial jury is met when "the prospective juror has given final, unequivocal assurances, deemed credible by the judge, that for purposes of deciding the case, [he] can set aside any opinion [he] might hold, relinquish [his] prior beliefs, or lay aside [his] biases or [his] prejudicial personal experiences." *United States v.*

*Taylor*, 777 F.3d 434, 441 (7th Cir. 2015) (quoting *United States v. Allen*, 605 F.3d 461, 464–65 (7th Cir. 2010)).  These conditions are satisfied here.  After being questioned on this twice, Juror 17 gave unequivocal assurances – even directly to the face of the defendant upon questioning--that he could be fair on both occasions.

Nichols relies on *United States v. Arocho*, 305 F.3d 627 (7th Cir. 2002), but that case does not change the result.  At issue there was whether a juror honestly responded to questions during *voir dire*.  "To obtain a new trial on this basis, a party must demonstrate that a juror failed to answer honestly a material question on *voir dire*, and that had the juror provided the correct response, that response would have provided a valid basis for a challenge for cause."  *Id*. at 633 (citations omitted).  Nichols fails to establish the first prong of this test.  That is, to the extent that Nichols asserts that Juror 17 dishonestly responded to questioning—namely, the question of whether he knew Nichols—Nichols has failed to demonstrate that Juror 17's lack of affirmative response to that question was a falsehood.  All that Nichols has put forward on this claim is his own assertion that he "recalls this juror when he was at that home."  (Dkt. 279) at 3.  Although this establishes that Nichols and Juror 17 may have been in the same place at the same time, it does not provide any details that would support an inference that the two knew each other such that Juror 17's non-response to the Court's question was a lie.  Further, like defense counsel in *Arocho*, Nichols had the opportunity to ask Juror 17 further questions about his time working security for Solace Place during *voir dire*, but he chose not to.  He cannot now "sandbag" the government by claiming Juror 17 failed to answer *voir dire* questions truthfully.  *Id*. at 635.  Accordingly, Nichols is not entitled to a new trial based on any issues with Juror 17.

### E.    The Government Did Not Knowingly Introduce False Testimony

Nichols also argues that he is entitled to a new trial because the government committed outrageous conduct by knowingly eliciting false testimony from Jameela and Michelle.  *See* (Dkt.

279) at (2)(A)–(C).  Of course, the government's use of false testimony to obtain a conviction is a violation of due process.  *McGeshick v. Fiedler*, 3 F.3d 1083, 1087 (7th Cir. 1993) (citing *Napue v. Illinois*, 360 U.S. 264 (1959)).  But that did not happen here.  To receive a new trial based on the government's use of allegedly perjured testimony, a defendant must show that "(1) the prosecution's case included perjured testimony; (2) the prosecution knew, or should have known, of the perjury; and (3) there is a likelihood that the false testimony affected the judgment of the jury."  *Simental v. Matrisciano*, 363 F.3d 607, 615 (7th Cir. 2004) (citation omitted).  Mere inconsistencies in government witnesses' testimony, however, do not establish the government's knowing use of false testimony.  *United States v. Saadeh*, 61 F.3d 510, 523 (7th Cir. 1995) (citing *United States v. Verser*, 916 F.2d 1268, 1271 (7th Cir. 1990)).  Rather, "the alleged perjured testimony must bear a direct relationship to the defendant's guilt or innocence" or "it must relate to a material fact as opposed to some collateral issue."  *United States v. Adcox*, 19 F.3d 290, 295–96 (7th Cir. 1994).  Finally, when a defendant alleges that the prosecution used perjured testimony, the Court must inquire into whether the defendant had adequate opportunity to expose the alleged perjury on cross-examination.  *Saadeh*, 61 F.3d at 523.

### 1.    Jameela's Testimony

As relevant to Nichols's motion for a new trial, Jameela testified at trial that she had seen Nichols with a gun "[e]very time we moved to a different hotel."  Tr. at 391.  She also authenticated a handful of still photographs from a music video for Nichols's rap group, the Hit Squad, in which she testified that Fears was holding Nichols's gun.  *Id*. at 396–98.  Nichols did not object to the admission of either the video or the stills.  Jameela testified that she danced in the video.  *Id*. at 396.  Regarding one of the stills, Government Exhibit 201-F, Jameela testified:

Q. . . . Ms. Jameela, on the left-hand side, whose body is in this video?
A.  Mines.

Q. And on—there's a man on the right-hand side of the video.  Who is that man?
A. That's Buck holding the gun.
Q. The same gun?
A. Yes.

*Id*. at 398.  An excerpt of the video was played in open court, and in one shot, Jameela again testified that Nichols was holding the gun:

Q. Ms. Jameela, at the end there, is Buck pointing a gun at you?
A. At my booty.
Q. And that's a real gun, right?
A. Yes.

*Id*. at 399.  On cross examination, Nichols confirmed Jameela's testimony on direct examination: "Q. And you 100 percent correct that I had a gun in my hand in that video?  A. Yes."  *Id*. at 451. He then played the rap video in its entirety and asked Jameela about the gun again, to which she replied:  "As I look in the video, [another Hit Squad member known as] County had the gun. . . . As I look at it in front of me and look at it closely, it's not your arm."  *Id*. at 452.

Based on this discrepancy, Nichols argues that the government purposefully and strategically introduced Exhibit 201-F and only played a portion of the video (Government Exhibit 201) to mislead the jury into believing that Nichols was holding the gun because viewing the video in its entirety "clearly showed" that Nichols did not hold a gun in the video.  (Dkt. 279) at 4.  On the other hand, the government contends that Jameela's testimony simply was mistaken and not perjurious.  (Dkt. 312) at 65–66.  As the Court acknowledged during trial, the video at issue is a rap video with lots of movement and the camera cutting between various scenes and is "confusing" and contains "a lot of movement and a lot of music and a lot of hands and faces and derrieres being flashed all over the place" (Tr. at 1467, 1470), and thus, even though Nichols was not holding the gun at the point in the video where Jameela first testified that he was or in Exhibit 201-F, Nichols has failed to show that the government knew or should have known that Jameela's testimony on this point was false as opposed to mistaken.  More importantly, Nichols effectively cross examined

Jameela to get her to say that she was mistaken when viewing the video. The jurors had an opportunity to view the cross examination and determine from Jameela's response whether she intentionally misrepresented the video intentionally or whether she was enlightened that she made a mistake during the cross examination. The jurors clearly credited her testimony that she was mistaken.

Even if he had been able to show that Jameela intentionally lied about the videao, , Nichols would not be entitled to a new trial on this ground because he also failed to show a likelihood that the false testimony affected the judgment of the jury for at least two reasons. First and most significantly, Nichols very effectively corrected the false or mistaken testimony on cross examination. That is, he got Jameela to admit directly that it was not his hand holding the gun. *See* Tr. at 1467 (noting that Nichols "crossed her and you broke the statement on direct, and you effectively crossed her and got her to say upon review it wasn't your hand."); *Saadeh*, 61 F.3d at 523–24 (denying motion for new trial; defendant took advantage of ample opportunity to cross examine witness, discredit him, and expose any alleged perjury).

Second, Nichols does not attempt to argue, let alone set forth evidence, that Jameela's testimony actually prejudiced him during trial. To be sure, this testimony about Nichols holding the gun in the video was only one piece of evidence among many about Nichols's possession of a gun from 2012 to 2014. Jameela herself offered other testimony on this point, testifying that Nichols kept a gun with him at the hotels for protection and that he threatened to blow people away with it. In addition, many other witnesses testified about Nichols's possession of a gun or guns, including Nichols himself, and both Nichols and Wright testified about an incident where Nichols shot at Candace—in the back and in the face—with a BB gun. Further, the evidence concerning the gun was only one aspect of Nichols's use of force, threats of force, or coercion. As already

detailed above, the government introduced more than sufficient evidence on this element. Finally, following Jameela's testimony, the Court instructed the jury that it could consider the gun "when weighing whether or not the defendant used force, threats of force, or coercion to cause a victim to engage in a commercial sex act, but you should not consider it for any other purpose. Keep in mind that the defendant here is on trial for sex trafficking and not for a gun offense. And those gun offenses are not charged." Tr. at 460. Because of the additional overwhelming evidence and the Court's corrective instruction, the presence of the gun in Nichols's personal space at the point where it was displayed in the video and still frame (Exhibit 201-F) was not overly prejudicial.[9] For all of these reasons, Nichols has not shown that Jameela's testimony about the video prejudiced him by affecting the judgment of the jury, that is, that it bore a direct relationship to his guilt or innocence. *See Van Eyl*, 468 F.3d at 436; *see also Kuzniar*, 881 F.2d at 470. Jameela's testimony therefore does not constitute grounds for a new trial.

### 2.    Michelle's Testimony

### i.    April 2014 Injuries

At trial, the government questioned Michelle about the April 2014 beating that resulted in a hospital stay and stiches. Nichols takes issue with certain of Michelle's details about the incident: that "[Nichols] threw me out [of the car] at the entrance at Ingalls [Hospital]. And the paramedics had to come out and get me because I was unconscious." Tr. at 585. Michelle also testified that she still has "visible injuries from that incident," including "stitch marks" in her head, "[m]y bone is sticking out of my hand. And I have a bone sticking out of my back." *Id*. at 640–41. In connection with this testimony, Nichols points to a record of Michelle's visit from Ingalls Hospital, which the government produced in discovery and admitted at trial through a hospital records

---

[9] What is more, the Court excluded evidence or testimony about Nichols's 2011 conviction for aggravated unlawful use of a weapon in a vehicle as overly prejudicial. *See* Tr. at 1529–35.

custodian, which stated that she was "ambulatory," her gait was steady, and she did not sustain any fractures. *See* Gov't Ex. 305 (INGALL_001-000006–42); Tr. at 678–70. Nichols argues that in light of Exhibit 305, Michelle lied about "what took place," and that the government elicited this false testimony from Michelle "knowing full well that no medical record supported any of that testimony." (Dkt. 279) at 4; *see also* Tr. at 1471 ("Her testimony is so grossly disproportionate to the medical records that it couldn't possibly be anything other than perjurious."). To be sure, Nichols does not deny that he hit Michelle, he threw a flip phone at her head (Tr. at 1610), and she required medical attention. Instead Nichols argues that Michelle's testimony about how she got into the hospital and her lasting injuries was demonstrably false and therefore merits a new trial.

Many of the details to which Michelle testified are corroborated by the medical records. For example, she testified that the flip phone "bust [her] head open," necessitating three stitches and that she ended up with black eyes and bruises from her neck to her feet. *Id.* at 587, 589–90. The medical records similarly reflected that she had been distressed from pain, she presented with a three-centimeter laceration on the left side of her forehead requiring three sutures, and she had "ecchymosis" noted on her neck, left hand, left eye, back, and knees. *See* Gov't Ex. 305. She reported sustaining the injuries from being "kicked, choked, and punched by her xboyfriend." *Id.*

Regarding the two areas of disputed testimony, compared to the medical records, Michelle's testimony was at worst mildly inconsistent. *Saadeh*, 61 F.3d at 523. Michelle described the trauma she endured in this incident—a long beating followed by head trauma. She testified as to her understanding of her injuries and what happened when the beating ended. It may have been that Michelle thought she passed out when she got to the hospital. Her imperfect or possibly exaggerated recollection as to how she got inside the hospital can hardly be deemed perjurious based on her perspective at the time of the event. *See* Tr. at 679 ("Well, I did have a

phone chucked at my head, so, you know, those memories of that day—").  As for her testimony

that bones are still sticking out of her hand and back, Nichols similarly fails to provide any

evidence that Michelle committed perjury.  Although he points to the medical records that say that

Michelle did not sustain any fractures (although the records note abrasions on her back and left

hand, *see* Gov't Ex. 305 at INGALL_001-000026), the record is clear that Michelle is not a

medical professional nor does she have any medical knowledge.  Michelle testified that she only

went to school through the eleventh grade.  Tr. at 533.  Therefore, her testimony that she currently

has bones out of place again is her personal interpretation of her injuries.  To the extent Michelle's

interpretation differs from the medical records, such testimony does not rise to the level of perjury

but is a mere inconsistency.

Even assuming that Michelle perjured herself on these points and that the government knew

of such perjury, Nichols has not proven that there is a likelihood that the false testimony affected

the judgment of the jury.  This is particularly true considering the big picture of this violent event.

The core facts of this episode are that Nichols caught Michelle texting Fears and he beat her so

badly that she needed medical attention.  Whether she walked into the hospital or not and whether

she sustained lesser injuries (not fractures) from being "kicked, choked, and punched" do not

undermine the significance of Michelle's testimony.  What even Nichols corroborated was that she

was injured and left at the hospital for treatment.  That is, these two aspects of the event are not

related to Nichols's guilt or innocence.  Even if Michelle had testified with perfect consistency to

the records, the evidence at trial nonetheless established that Nichols badly beat Michelle in April

2014 for texting Fears.

As a final point, Nichols had the medical records at issue in his possession to cross examine

Michelle.  *See Saadeh*, 61 F.3d at 523 (the court must consider "whether the defendant had

adequate opportunity to expose the alleged perjury on cross-examination"); *see also* Tr. at 1057–58 (noting that Nichols had the records at the time of cross and could have used them for their impeachment value at that time). For whatever reason, despite his ample opportunity, he did not use the records to explore these now-challenged aspects of her testimony. For example, he never questioned her about her testimony about the lasting injuries to her hand and back. He did, however, question her about these aspects using a portion of her grand jury testimony, wherein she stated that she had to crawl into the hospital. Tr. at 678–82. Eventually Nichols asked "[s]o if that's what happened, then the hospital records should reflect that then, right?," to which Michelle replied, "Yeah." *Id*. at 682. Further, with the hospital witness, he highlighted the phrases "Patient arrives ambulatory," "Gait steady," and "No fractures," during his questioning. *Id*. at 768–70. Even though he decided not to use the records during his cross of Michelle, Nichols still brought out the inconsistencies in her recollection about arriving at the hospital. Overall, Michelle's testimony did not result in any unfairness to Nichols and it is not grounds for a new trial.

### ii. Dropping off Minor A at School

Nichols also takes issue with Michelle's testimony that he knew Minor A's age because he once drove her to "middle school." (Dkt. 279) at 4–5. He points to Minor A's testimony that she was not in school when she worked for Nichols and that he therefore never drove her to any school. Tr. at 1155. However, Nichols again fails to prove that this testimony entitles him to a new trial. Most significantly, the school testimony at issue was elicited by Nichols on cross examination as impeachment. It was not included in the prosecution's case. In fact, Michelle testified on direct examination that she did not know Minor A's age until after the case started, although she had observed Minor A acting childish. *Id*. at 639–40. Crossing her on when she first learned Minor A's age, Nichols used Michelle's grand jury testimony that Nichols had mentioned to Michelle

that he was taking Minor A and another girl to school, which made Michelle understand that Minor A and the other girl were in fact minors. *Id.* at 696. Michelle agreed with her grand jury testimony and also her trial testimony. Accordingly, Nichols fails to meet the first or second elements of the false-testimony test. *See Simental*, 363 F.3d at 615 (a defendant must show "(1) the prosecution's case included perjured testimony; (2) the prosecution knew, or should have known, of the perjury; and (3) there is a likelihood that the false testimony affected the judgment of the jury."). Continuing with this analysis, Nichols also cannot meet the third element. All of the testimony on this point regarded Minor A's age at the time she worked prostituting herself for Nichols. Ultimately, the jury did not find that Nichols knew or recklessly disregarded that Minor A was a minor. Instead, he was convicted on Count 4 because the jury found that he used force, threats of force, or coercion to compel Minor A to engage in commercial sex acts. Dkt. 267 (verdict form). Thus, Michelle's testimony about Nichols's knowledge of Minor A's age cannot be said to have affected the jury in a manner that entitles Nichols to a new trial. Finally, Nichols had ample opportunity to cross examine Michelle about her testimony concerning Minor A's age, and he did so with the disputed school testimony.

In support of his argument Nichols cites *Miller v. Pate*, 386 U.S. 1 (1967) for the proposition that "physical evidence that creates a false impression of fact" violates due process. But Nichols does not point to any physical evidence offered by the government that created a false impression of material fact (all of the evidence that he specifically takes issue with was testimonial), and regardless, this case is nothing like *Miller*, where the prosecution offered as evidence a pair of "blood-stained" shorts and an expert witness who testified that the blood type on the shorts was the same as that of the victim, knowing full well that the shorts were stained with

paint instead. Unlike *Miller*, the government did not knowingly present false evidence and Nichols had a full opportunity to cross examine the testifying witnesses regarding questionable testimony.

### F.     The Court Did Not Err in Limiting Nichols's Cross Examination

Next, Nichols argues that the Court erred by limiting cross examination when the Court (1) excluded a Facebook post dated March 14, 2018 containing a picture of Michelle holding a pistol, (2) prevented Nichols from exploring the extent of the benefits Michelle received from the Government for her testimony, (3) "sustain[ed] the government's objection to [Nichols's] cross examination on the law enforcement agents instructing cooperating witnesses to 'lie' about matters known to be false." (Dkt. 279) at (3), (4), (5).

The Sixth Amendment's Confrontation Clause guarantees criminal defendants the right to confront witnesses at trial. *United States v. Linzy*, 604 F.3d 319, 323 (7th Cir. 2010). It "reflects the belief that adversarial proceedings are essential to the truth-seeking function." *United States v. Khan*, 508 F.3d 413, 418 (7th Cir. 2007). That being said, "there is no guarantee of cross-examination to whatever extent the defense might wish." *United States v. Recendiz*, 557 F.3d 511, 530 (7th Cir. 2009) (internal quotation marks and alteration omitted); *see also United States v. Beavers*, 756 F.3d 1044, 1052 (7th Cir. 2014) (although "the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense . . . [it] does not require the admission of irrelevant evidence (or other types of evidence whose relevance is outweighed by other important considerations)") (internal citations omitted). Put differently, the court must allow effective cross examination, but effective cross examination is not akin to unlimited cross examination. *Linzy*, 604 F.3d at 323. The court has "wide latitude . . . to impose reasonable limits on such cross-examination based on concerns about . . . harassment, prejudice, confusion of the

issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986).

Considering first the social media photograph of Michelle holding a gun, Nichols argues that because she testified to his possession of guns, the picture "went directly to the truth and veracity on this point." (Dkt. 279) at 6. But he does not even attempt to explain how the photograph of Michelle holding a gun in March 2018 impacts her testimony that Nichols possessed a gun or guns during the 2012 to 2014 time period and the Court cannot draw this link without more. Nichols's second, more general argument is that the photograph goes to Michelle's overall credibility and that the exclusion of the photo denied him the right to confront Michelle. *Id*. At trial, Nichols sought to have the photo admitted "[t]o show that she is, in fact, not a law-abiding citizen; that despite her claims that it was Mr. Nichols who got her into this life and who kept her in this life, that, in fact, this is more her character, and that she's acting autonomously without his influences years after their separation." Tr. at 754. The Court did not permit Nichols to introduce the photograph during his cross examination of Michelle.

This exclusion did not violate Nichols's constitutional right to cross examine Michelle. Federal Rule of Evidence 608(b) provides that "[e]xcept for a criminal conviction under Rule 609, extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness. But the court may, on cross-examination, allow them to be inquired into if they are probative of the character for truthfulness or untruthfulness of" the witness. Here, Nichols was given significant leeway with which to question Michelle's character for truthfulness on cross examination, questioning her at length after her direct testimony and then having the opportunity to cross examine her once more using a February 9, 2016 call between Michelle and Nichols while he was in custody at the MCC. On both

occasions, Nichols had ample opportunity to impeach Michelle and he effectively did so by raising her past drug use, her flawed memory, lies that she told him in jail calls, and her other instances of unlawful behavior. On that last point, Michelle had already testified on direct that she had been convicted of possession of a controlled substance (a felony). Tr. at 536. She also testified to having sex for money during the relevant time frame, stealing guns, selling guns, doing drugs, stealing drugs, and selling drugs during that time. Although she later testified that she was trying to get her life together, she also clearly testified on cross examination that it was "not at all" fair to say that she is a law-abiding citizen now. *Id.* at 753.

Once a trial court permits a defendant to expose a witness's motivation, it is of peripheral concern to the Sixth Amendment how much opportunity defense counsel gets to hammer that point home to the jury." *Recendiz*, 557 F.3d at 530 (citing *United States v. Nelson*, 39 F.3d 705, 708 (7th Cir. 1994)). Accordingly, the Court did not err in excluding the photograph because Michelle already had testified that she was not law abiding and Nichols already had successfully impeached her on this and other grounds. *See id.* at 530 (it would offend the Sixth Amendment to deny a defendant the ability to establish that the witness had a motive to lie, but once that motivation has been established, the defendant has no constitutional right to pile on); *Van Arsdall*, 475 U.S. at 679 (after the motive has been established, a judge has a wide latitude to impose reasonable limits on cross-examination); *United States v. Williams*, 892 F.3d 242, 249 (7th Cir. 2018) (same).

In light of this evidence and impeachment, the extrinsic evidence of Michelle exhibiting unlawful behavior four years after the events charged in the Superseding Indictment had minimal overall relevance to Michelle's character for truthfulness (if any). Whatever marginal relevance the picture had was outweighed by concerns of prejudice, misleading the jury, and the cumulative effect of the photograph. *See* Fed. R. Evid. 403; *United States v. Ozuna*, 561 F.3d 728, 738 (7th

Cir. 2009) ("a district court may exclude collateral or irrelevant evidence where its tendency to mislead and confuse the jury substantially outweighs its probative value"); *see also Carson*, 870 F.3d at 597 ("district court judge can decide that the defendant has had ample opportunity to demonstrate motivation and that additional cross-examination is either not relevant, too prejudicial, would confuse the jury, is repetitive, or any of the other many reasons a district court might limit the scope of cross examination").

Looking next at the extent to which Michelle was questioned about the benefits she received in exchange for her testimony, although Nichols mentions "numerous instances" in which the Court sustained the government's objections on this subject matter, he does not point to any with specificity or even argue why they were improper. *See* (Dkt. 279) at 6. Nichols's undeveloped and unsupported argument therefore is waived. *Holm*, 326 F.3d at 877; *McLee*, 436 F.3d at 760. Further, the Court's review of the trial transcript reveals no error in its rulings regarding Nichols's cross of Michelle on this topic. Michelle testified on direct examination that she received lodging and money for her daily expenses during the trial and had received food, shelter, and help with her everyday needs from some FBI agents over the past few years. Tr. at 536. On cross, Nichols explored this testimony, asking for further specifics as to the benefits she received, although he limited his questioning to asking how much money she received and whether she had been coached in her testimony. *Id*. at 645. No objections were lodged. When Michelle was recalled a few days later to testify as to the February 2016 jail call, the government moved to preclude any questioning on "previously explored areas of bias, such as her hotel stay and her per diem payments that she continues to attain while staying, waiting for the trial to conclude." *Id*. at 1051–52. Neither Nichols nor his stand-by counsel opposed the oral motion, and they instead indicated that they wished to explore statements Michelle made in the call—that she had been

bribed by the government to testify, that she did not want to cooperate with the investigation, and

that she was never forced into prostitution by Nichols. *Id*. at 1052–53. On these arguments, the

Court appropriately limited her testimony to the scope of the call noting that she already had

"testified thoroughly." *Id*. at 1056–57.

On the stand, the call was played and Michelle confirmed to Nichols that it was her voice

on the call. The government then asked:

> Q. Michelle, did the FBI ever coerce you?
> A. No.
> Q. Did anyone from the U.S. Attorney's Office or federal government ever coerce
> you during the course of this investigation or case?
> A. No.
> Q. Did anyone from the FBI or the U.S. Attorney's Office bribe you?
> A. No.

*Id*. at 1064–65. The government asked additional questions about statements Michelle made in

the call and her motivations for such statements, which included Michelle's testimony that she had

received threatening calls from Stallion and Kaila regarding her participation in Nichols's

prosecution. Nichols asked questions on further recross, and his questioning elicited around 13

objections from the government, some of which were sustained. However, the objectionable

questions mostly pertained to how or why Michelle would feel threatened by Stallion, Kaila, or

Nichols or they involved improper commentary to the jury between questions. *See id*. at 1068–77

(for example, sustaining objections to questions as to why Stallion and Kaila would threaten

Michelle because they were speculative, sustaining an objection to a question as to whether

Nichols knows anyone in New York as lacking foundation, sustaining an objection to a question

as to how someone could call and threaten Michelle if he or she did not have her phone number as

calling for speculation, sustaining an objection to Nichols's comments from the lectern). Notably,

Nichols asked a few questions going to Michelle's truthfulness that the Court allowed over the

government's objections. *See id*. at 1069 ("So is it true that when you lie to someone, you have to

keep lying to cover up the first lie?"), 1077 ("Are you a liar?").  During his recross, Nichols did not ask questions that probed into Michelle's receipt of any benefits from the government, and in any event, the Court finds no basis to conclude that any of its rulings on the government's objections to Nichols's questioning were erroneous.

Finally, Nichols complains that he was not permitted to cross examine witnesses about law enforcement's instructions that they lie about matters known to be false and that the Court improperly barred him from using the term "lie" in his cross examination of the government's witnesses.  (Dkt. 279) at 6.  Nichols does not specify to which witnesses he believes this argument applies, nor does he point to any particular testimony or objections that fall under this category. Again, not only is this argument woefully undeveloped and therefore waived, it is completely without merit.  As the government points out in its response brief, Nichols was permitted to cross examine numerous witnesses about their knowledge of what it means to testify under oath and whether they were lying during their testimony or had lied to the grand jury.  *See* (Dkt. 312) at 77–79; *see also, e.g.*, Tr. at 680 (asking Michelle, "so lying isn't a big deal to you?"), 730 (asking Michelle, "You also testified yesterday about you basically were lying and manipulating me to have me come get you because you wanted to be bond out of jail.  Am I correct?"), 757 (asking Michelle if she was "lying and manipulating" the jury), 833 (asking Betty Jo, "So you just lied to the jury?"), 954 (asking Ciara, "Q. So are you lying to these people or to the grand jury?  A. I'm not lying to no one."), 1069 (asking Michelle, "Q. Is it true that when you lie to someone, you have to keep lying to cover up the first lie?  A. To you, yeah. I'm not lying to the jury. I lied to you. It's a whole different thing. That was for my safety to make you think that I wasn't telling."), 1357 (asking Wright, "Do you know that if you lie on that stand, you can go to jail?").  Of course, the Court precluded Nichols from making comments to the jury or accusations during witness

testimony that the witnesses were lying (*see, e.g.*, Tr. at 1357 (saying to Wright, "Well, you need to stop lying.")), but that was more than appropriate.

Beyond the appropriateness of the Court's rulings on Nichols's cross examination of government witnesses, Nichols once again fails to identify or evince that any limitation on his cross examination actually prejudiced him during trial. *See* (Dkt. 279) at 5–6. Without having made such a showing, he is not entitled to a new trial. Accordingly, the Court acted within its discretion to limit Nichols's cross examination in the ways discussed above and Nichols's motion for new trial is denied on this basis.[10]

### G.    Admission of Other Bad Acts of Fears

Nichols argues that the Court erred by allowing testimony about the crimes, wrongs, or bad acts of Fears, which he claims prejudiced him. *See* (Dkt. 279) at (10). However, he did not develop this argument by identifying anything he believes to have been erroneously admitted or even explaining why exactly any evidence was entered in error, and thus this argument too is waived. *Holm*, 326 F.3d at 877; *McLee*, 436 F.3d at 760.

Regardless, Nichols was charged in Count 1 with conspiring with Fears and others to engage in sex trafficking. The government presented evidence about specific facts and incidents involving Fears that directly related to the charged sex trafficking conspiracy as well as the sex trafficking of the victims during the time frame charged in the Superseding Indictment. In other words, the government did not seek to admit *propensity* evidence about Fears and as such, Rule 404(b) is not applicable. *See* Fed. R. Evid. 404(b); *see United States v. Ferrell*, 816 F.3d 433, 443

---

[10] To the extent Nichols otherwise generally complains that the Court denied him the right to confront the government's witnesses (*see* (Dkt. 279) at 6), this argument is underdeveloped and perfunctory, and therefore it is waived. *See United States v. Hassebrock*, 663 F.3d 906, 914 (7th Cir. 2011) (finding the argument was "decidedly underdeveloped and therefore waived"); *United States v. Foster*, 652 F.3d 776, 792 (7th Cir. 2011) ("As we have said numerous times, undeveloped arguments are deemed waived") (internal quotation marks and citation omitted).

(7th Cir. 2015) ("Rule 404(b) does not apply to direct evidence of the crime charged") (citing *United States v. Adams*, 628 F.3d 407, 414 (7th Cir. 2010), *United States v. Alviar*, 573 F.3d 526, 538 (7th Cir. 2009)). Where "evidence is embraced by the conspiracy in the indictment, the court need not resort to Rule 404(b) analysis." *Alviar*, 573 F.3d at 538; *see also United States v. Watts*, 535 F.3d 650, 659–60 (7th Cir. 2008) (rejecting defendant's Rule 404(b) challenge to evidence of defendant's acts in furtherance of conspiracy). To the contrary, the evidence at issue pertained to Nichols's and Fears's actual trafficking business and they went directly to explain how it operated and how other individuals interacted within it. *See* (Dkt. 153). "This is not, therefore, another bad act, but rather part and parcel of the crime at issue." *Carson*, 870 F.3d at 600.

Further, more than seven months prior to trial, the government filed a *Santiago* proffer in support of its motion to introduce the hearsay statements of co-conspirators made in furtherance of a conspiracy pursuant to Federal Rule of Evidence Rule 801(d)(2)(E). *See* (Dkt. 154); *United States v. Santiago*, 582 F.2d 1128, 1131 (7th Cir. 1978) (trial court may conditionally admit co-conspirator statements before the government has independently established the conspiracy). The Court approved the *Santiago* proffer without objection. *See* (Dkt. 251). Further, as discussed above, the government made an adequate showing that a conspiracy existed between Nichols and his co-conspirators and thus under Rule 801(d)(2)(E), statements by his co-conspirators in furtherance of the conspiracy are admissible non-hearsay. *See United States v. Pust*, 798 F.3d 597, 602 (7th Cir. 2015).

During the proceedings, Nichols did not raise any Rule 404(b) objections and in fact, stand-by counsel stated that "having read the *Santiago* proffer, I don't believe that there is an area that's 404(b) at this point." Tr. at 285. Instead, Nichols objected to the admission of testimony about Fears on relevance grounds. *Id*. at 546–47. In overruling the objection, the Court explained that

the evidence about Fears and his girls "is relevant to the indictment because you are charged in a conspiracy. And the conspiracy, although he has pled to it, is still the charge against you. . . . It's relevant to the elements of what's charged. And I've already admitted the co-conspirator proffer, there being no objections." *Id*. at 572–73. In total, the direct evidence of Fears's actions relating to sex trafficking during the relevant time period was both admissible and relevant to the conspiracy at issue. *Carson*, 870 F.3d at 600.

### H. The Court Did Not Improperly Admit Physical or Hearsay Evidence

Nichols next argues that the Court erred "in several instances admitting certain hearsay evidence which evidence did not fall into any of the cognizable exceptions to the hearsay rule" and generally by admitting physical evidence. *See* (Dkt. 279) at (11), (18). As with many of his other arguments, Nichols has waived these perfunctory assertions by failing to develop them at all. Courts are not obligated "to research and construct the legal arguments open to parties, especially when they are represented by counsel." *Holm*, 326 F.3d at 877 (quotations and citations omitted).

To be fair, Nichols lodged a handful of hearsay objections during trial, but the Court has not found reason to disturb its rulings on those issues. For example, the Court properly overruled Nichols's hearsay objection to testimony from police officer that he was informed that Minor A was 13 years old because such testimony was not offered to prove Minor A's age, but rather to show the effect on the listener or discuss the course of the investigation. *See* Tr. at 489; *United States v. Shaw*, 824 F.3d 624, 630 (7th Cir. 2016). Further, Nichols suffered no prejudice from this ruling, as the jury did not find that he knew or recklessly disregarded the fact that Minor A was a minor. Similarly, the Court properly overruled Nichols's objection to Michelle's testimony about threats she received from Stallion in connection with her participation in the case for the same reason—the effect the threats had on Michelle and how she reacted to them. Tr. at 1067. As another example, the Court correctly overruled Nichols's hearsay objection to Minor A's

description of what Candace said about how Nichols treated her because such statements were included in the unobjected-to *Santiago* proffer and were not hearsay as statements of Nichols's employee or agent on a matter within the scope of that relationship while it existed or co-conspirator. Tr. at 1100; Fed. R. Evid. 801(d)(2)(D), (E).

Regarding the physical evidence introduced at trial, which included photographs, text messages, emails, social media records, hospital records, hotel records, and Backpage advertisements, Nichols failed to object to this evidence both (1) before trial either by moving *in limine* for its exclusion or by responding to the government's motions *in limine* for admission of certain records, or (2) at trial before the Court admitted the evidence. Nichols had numerous opportunities to object to the trial evidence, but he did not, and even in his motion for a new trial he fails to properly identify any objectionable exhibits. Further, on both points, Nichols fails to assert any argument to explain how he believes the contested evidence prejudiced him. For all of these reasons, Nichols's motion for a new trial is denied on these grounds.

## I. Government's Closing Argument

Nichols argues that he is entitled to a new trial based on various things that happened during closing arguments: the Court erred in overruling his objections to the government's closing where the prosecutors "made specific argumentative and prejudicial comments in reference to the defendant, prejudicially misrepresented prospective evidence and made substantial misrepresentations not supported by the evidence," *see* (Dkt. 279) at (7), *id*. at (20) (identical argument); the government committed reversible error when it argued "personal vouching and brought up new facts, conclusions, and arguments in closing argument unrelated to the defendant's closing argument," *see id*. at (8); the government's closing argument was unduly prejudicial and deprived him of a fair trial, *see id*. at (12).

Aside from simply noting that the government's closing included prejudicial comments or prejudicially misrepresented evidence, Nichols critically does not even attempt to show how anything in the closing argument or rebuttal prejudiced him. This alone is a sufficient basis on which to deny Nichols's motion for a new trial on his closing-argument concerns. *See Van Eyl*, 468 F.3d at 436; *see also Kuzniar*, 881 F.2d at 470. In any event, the Court will address Nichols's specific arguments to the extent that they are developed and ascertainable. In fact, only his argument that his objections to the government's closing were improperly overruled presents an argument that contains enough identifying information to merit discussion.

Nichols did not make any objections during the government's closing argument. *See* Tr. at 1715–66. Thereafter, during the government's rebuttal argument, Nichols made five objections. The first instance was as follows:

> MS. STREIKER: . . . The defendant kept saying that the women weren't forced, that they had choices, so he didn't commit sex trafficking. And he kept saying that he hit women for personal reasons, not business, so he didn't commit sex trafficking.
> THE DEFENDANT: Didn't -- objection.
> THE COURT: Overruled.
> THE DEFENDANT: I didn't say that.

Tr. at 1820. The Court's ruling was correct. Because Nichols argued in closing that he never forced anyone to do anything, he hit the women and girls but that was strictly personal and had nothing to do with business (*see* Tr. at 1775, 1780, 1799, 1800, 1817 ("Facts. I hit people. That's a fact. But never over business."), 1609 (arguing that he was not on trial for domestic violence)), the prosecutor's rebuttal argument was a proper response. *United States v. Taylor*, 728 F.2d 930, 936 (7th Cir. 1984) ("It is settled in this circuit that, in their summations to the jury, prosecutors are entitled to respond to arguments articulated by defense counsel.").

The second objection was as follows:

> MS. STREIKER: . . . In fact, you don't need to find any physical violence at all. What you do need to do under the law --
> THE DEFENDANT: She can tell them that? Objection --
> THE COURT: Overruled.
> MS. STREICKER: -- is to consider whether his actions overall, as a whole, all of the violence, all of the threats, all of the coercion, whether all of that, as a whole, overall, caused women to engage in commercial sex acts. That's the law. . . .

Tr. at 1820–21. Again, there was no error. The prosecutor gave a correct characterization of the jury instructions and the law. The TVPA criminalizes sex trafficking where an individual acts "in reckless disregard of the fact, that means of force, threats of force, fraud, coercion described in subsection (e)(2), or any combination of such means will be used to cause the person to engage in a commercial sex act." 18 U.S.C. § 1591(a). Threats of force and coercion, which are available to prove a violation of the TVPA, may not encompass physical violence. Correspondingly, the Court properly instructed the jury that "[c]oercion means: (1) threats of serious harm to or physical restraint against any person; or (2) any scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm to or physical restraint against any person." (Dkt. 263) at 42; *see* 18 U.S.C. § 1591(e)(2). The Court further instructed: "Serious harm means any harm, whether physical *or non-physical*, *including psychological, financial, or reputational harm*, that is sufficiently serious, under the circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity in order to avoid incurring that harm." (Dkt. 263) at 43 (emphasis added); *see* 18 U.S.C. § 1591(e)(5). Thus, the prosecutor's statement was an accurate recitation of the law and Nichols's objection was properly overruled.

As for the third objection:

> MS. STREICKER: . . . And to go back to these hotel records for a minute, the defendant said in his closing, he talked about how the rooms weren't in his name. He didn't know what was going on in these rooms. The truth is he had Brandon put the rooms in his name --
> THE DEFENDANT: Objection.

> MS. STREICKER: -- to conceal --
> THE DEFENDANT: Objection. She's lying. I never said that. There's no evidence to prove that.
> THE COURT: Overruled.
> THE DEFENDANT: I bet.
> MS. STREICKER: He had Brandon put the hotel records in Brandon's name to conceal his involvement.
> THE DEFENDANT: Never said that.

Tr. at 1835. The Court's rejection of Nichols's objection was proper. The testimonial and documentary evidence introduced at trial clearly demonstrated that hotel rooms were rented in Wright's name. The prosecutor's rebuttal argument regarding Nichols's intent behind this—to conceal his involvement—was proper both as to the evidence and the reasonable inferences the jury could draw from the evidence. *See, e.g.*, Tr. at 1239 ("Q. What was your understanding of why the defendant had you put the room in your name? [WRIGHT:] To keep the heat off of him because in some of these towns the police know him for being a pimp."). Even though Nichols may not have directly testified as to his intent, the prosecutor's argument was permissible and the Court did not err in overruling the objection.

Turning to the fourth objection:

> MS. STREICKER: . . . The defendant argued he didn't know [Minor A's] age or Coco's age or Ciara's age or Little Baby's age when they were working for him. But you know he did.
> THE DEFENDANT: Objection.
> MS. STREICKER: You saw photos of them, for God's sake.
> THE DEFENDANT: Objection. I never said that. Why she steady saying stuff I never said?
> THE COURT: It's overruled. She's arguing from the evidence, not just what you said --
> THE DEFENDANT: When I say something, she don't say -- all right.
> THE COURT: Go ahead.
> THE DEFENDANT: Biased.

Tr. at 1837. Here again, the prosecutor's argument appropriately summarized the evidence and responding to Nichols's closing argument that "Maybe I just wasn't the brightest person in the

world or something and got tricked, but it wasn't purposely. I didn't—I didn't know. I would

never deal with minors. I just wouldn't do it." *Id.* at 1797. The Court's ruling was not error.

Finally, the fifth and last objection came about under the following circumstances:

> MS. STREICKER: . . . And, finally, I want to note, you have now seen defendant's
> conduct first-hand. You see how he's treated this Court, how he's treated this
> process, how he's treated me, how aggressive he became when a woman dared to
> question him. He said I was irritating, I was making him mad, and he was having a
> hard time controlling his anger.
> THE DEFENDANT: Object.
> MS. STREICKER: He put me down --
> THE COURT: Sustained -- overruled. Excuse me.
> THE DEFENDANT: It's not evidence.
> THE COURT: It is, actually. The demeanor of the witness on the stand when
> testifying can be taken into account by the jury when judging credibility. I'll give
> you an instruction on it.
> THE DEFENDANT: I bet.

Tr. at 1840–41. Although a defendant's nontestimonial courtroom behavior generally is not

evidence subject to comment, *Gomez v. Ahitow*, 29 F.3d 1128, 1136 (7th Cir. 1994), here Nichols

took the stand and testified in his defense. As the Court properly instructed the jury: "Part of your

job as jurors is to decide how believable each witness was, and how much weight to give each

witness' testimony, including that of the defendant. You may accept all of what a witness says, or

part of it, or none of it. Some factors you may consider include: . . . the witness' demeanor." (Dkt.

263) at 9. The specific statements referenced by the prosecutor—Nichols's aggressive behavior

upon questioning, saying that she was irritating, saying that she was making him mad, saying that

he was having a hard time controlling his anger, putting her down, as well as disrespecting the

Court and the trial process generally—all stem from comments made by Nichols on (or

immediately before) cross examination or his behavior during that process. *See, e.g.*, Tr. at 1539,

1571 ("This trial here is a—a big fucking lie."), 1558–59 ("THE COURT: You have to answer the

question. THE WITNESS: No, I don't. THE COURT: You do. THE WITNESS: Who is going

to make me? THE COURT: Me. THE WITNESS: How? What you all going to do? THE

COURT: I can hold you in contempt of court for not answering the question. THE WITNESS: I'm in jail."), 1573–76 ("The record will reflect that he is refusing in that he is ignoring the Court's direction."), 1579, 1582, 1587 ("THE COURT: Okay. I am directing you to answer the question. THE WITNESS: And I told you no."), 1591, 1599 ("MS. STREICKER: Do you think this is funny? A. I think you funny."), 1600 ("THE COURT: . . . And the record will reflect that he wrote 'U Cool' on the monitor while the prosecutor was getting the next exhibit."), 1607 ("THE COURT: No. Enough of that. We're not going to have you fight with the prosecutor."), 1620–21, 1626, 1628 ("A. – I want to call somebody out their name right now, but I didn't do it."), 1629, 1635 ("MS. STREICKER: Objection, Your Honor, to the defendant drawing on the board. THE WITNESS: Boring. . . . You're boring me. Are you almost finished?"), 1639, 1640 ("THE COURT: I'm directing you to answer the question. THE WITNESS: And I'm directing you not to please ask me questions about Kash, 'cause I'm not going to answer it."). Thus, it was appropriate for the prosecutor to comment on Nichols's testimonial behavior during closing.

Although the prosecutor's comments appear to be contained appropriately to Nichols's behavior and demeanor on the stand (*see* (Dkt. 312) at 93 (explaining that here, "the government was properly referring to the defendant's own testimony, including both his words and his demeanor")), the fact remains that he was in front of the jury each trial day acting as his own counsel and frequently making improper comments and acting rudely to the Court, prosecutors, and witnesses during the proceedings. To the extent that the prosecutor's comments can be understood to call some of Nichols's non-testimonial conduct into question particularly because some of the specific disrespectful behaviors mentioned occurred both on and off the stand, "[i]mproper prosecutorial comments during closing arguments are reviewed under a prosecutorial misconduct framework." *United States v. Richards*, 719 F.3d 746, 764 (7th Cir. 2013) (citation

omitted).  "This analysis requires, first a determination that prosecutors acted improperly, and second a conclusion that the improper conduct prejudiced the defendant."  *Id.* (citation omitted); *United States v. Badger*, 983 F.2d 1443, 1450 (7th Cir. 1993) (prejudice analysis looks at the entire record to determine if the defendant was deprived of the right to a fair trial).  Even if some of the prosecutor's comments could be considered improperly broad, the Court cannot find that her comments prejudiced Nichols.  This is for the same reason just mentioned—each of the behaviors mentioned in rebuttal, even if they also occurred when he was not on the stand, were on full display while he was testifying in his own defense.  Further, any prejudice that could have occurred from calling out Nichols's non-testimonial conduct was cured by the Court's instruction on this point, which read:

> Because defendant Samuel Nichols decided to act as his own lawyer, you heard him speak at various times during the trial.  He made an opening statement and a closing argument.  He asked questions of witnesses, made objections, and argued to the court.  I want to remind you that when defendant Samuel Nichols spoke in these parts of the trial, he acted as a lawyer in the case and his words are not evidence, similar to the objections and arguments of the parties.  The only evidence in this case comes from witnesses who testify under oath on the witness stand and from exhibits that are admitted.

(Dkt. 263) at 11.  The prosecutor did not act improperly and Nichols was not denied the right to a fair trial.  *See United States v. Wesley*, 422 F.3d 509, 518–19 (7th Cir. 2005) (improper comments during closing arguments rarely rise to the level of reversible error, and considerable discretion is entrusted to the district court to supervise the arguments of counsel . . . "A new trial is required only if the improper comments prejudiced the defendant's right to a fair trial.").  Overall, Nichols has not shown that the Court's rulings during the government's closings were erroneous.[11]

---

[11] In his Motion, Nichols cites to *Gradsky v. United States*, 373 F.2d 706 (5th Cir. 1967), which as relevant held that it was reversible error for a prosecutor to personally vouch for the credibility of two of the government's witnesses.  (Dkt. 279) at 10 (citing *Gradsky* and *United States v. Josleyn*, 99 F.3d 1182, 1197 (1st Cir. 1996) ("The important precept that the prosecutor may not vouch for the credibility of a

## J.     Jury Instructions

Nichol next argues that the Court erred in overruling his objections to the Government's proposed jury instructions #2, #23, #24, #25, and #27.  The corresponding final instructions are #2, #20, #25, #26, #27, #28, #29, #30, #31, and #37.[12]  For background, the Superseding Indictment charges Nichols in the conjunctive.  For example, Count 2 charges:

> Beginning no later than in or about 2012, and continuing until in or about October 2014, in the Northern District of Illinois, Eastern Division, and elsewhere,
>
> SAMUEL NICHOLS, a/k/a "Buck," and
> CHARLES FEARS, a/k/a "Kash,"
>
> defendants herein, in and affecting interstate commerce, knowingly recruited, enticed, harbored, transported, provided, obtained, ***and*** maintained by any means a person, namely, [Betty Jo], and benefitted financially and by receiving anything of value from participation in a venture which has engaged in recruiting, enticing, harboring, transporting, providing, obtaining, ***and*** maintaining by any means [Betty Jo], knowing and in reckless disregard of the fact that means of force, threats of force, ***and*** coercion, and any combination of such means, would be used to cause [Betty Jo] to engage in a commercial sex act;
>
> In violation of Title 18, United States Code, Section 1591(a) and (b)(1).

(Dkt. 51) at 3 (emphasis added to Nichols's disputed conjunctions).  The Jury Instructions were written in the disjunctive.  The instruction for Count 2 reads in part:

> In order for you to find that defendant Samuel Nichols committed sex trafficking by force, threats of force, or coercion, as charged in Count Two regarding Betty Jo, also known as Becky, the government must prove each of the three following elements beyond a reasonable doubt:
>
> 1. The defendant knowingly recruited, enticed, harbored, transported, provided, obtained, ***or*** maintained Betty Jo; or the defendant knowingly benefitted, financially or by receiving a thing of value, from participating in a venture that recruited, enticed, harbored, transported, provided, obtained, ***or*** maintained Betty Jo; and

---

government witness is deeply rooted in American law")).  Here, although Nichols makes the general argument that the government "argued personally vouching" he adds no more on this topic (such as the all-important detail of which witness or witnesses he believes the government to have vouched for).  Without these details, the Court cannot analyze his argument and it is therefore considered waived.

[12] The elements instructions (proposed instructions #23, #24, and #24) were broken out into separate instructions during the instruction conference.

2. The defendant knew or recklessly disregarded the fact that force, threats of force, **or** coercion would be used to cause Betty Jo to engage in a commercial sex act; and

3. The offense was in or affecting interstate commerce.

(Dkt. 263) at 26 (emphasis added to Nichols's disputed conjunctions).

Nichols argues that because the instructions use the disjunctive "or" instead of the conjunctive "and," they represent a material variance to the elements set forth in the Superseding Indictment. In other words, Nichols argues, as he did during the instruction conference, that the Court constructively amended the Superseding Indictment by accepting the challenged instructions. *See* (Dkt. 279) at (6); (Dkt. 294) at 3–4 ("Who is to say [what] the grand jury would have done, if they had been faced with the alternative elements presented to them."); *see also* Tr. at 1653–60, 1683–85, 1688, 1690, 1694–95. "Constructive amendment of the indictment can occur when either the government (usually during its presentation of evidence and/or its argument), the court (usually through its instructions to the jury), or both, broadens the possible bases for conviction beyond those presented by the grand jury." *United States v. Jones*, 418 F.3d 726, 729 (7th Cir. 2005) (quoting *United States v. Cusimano*, 148 F.3d 824, 829 (7th Cir. 1998)). A jury instruction that constructively amends the indictment implicates the defendant's right to have the grand jury's charges control the offenses actually tried; "a court cannot permit a defendant to be tried on charges that are not made in the indictment against him." *Id.* at 729–30 (quoting *Stirone v. United States*, 361 U.S. 212, 217 (1960)).

Jury instructions must be accurate statements of the law that are supported by the facts in the case. *See United States v. Mancillas*, 183 F.3d 682, 707 (7th Cir. 1999). Here, the contested instructions were just that; there is no dispute that corresponding section of the TVPA is written in the disjunctive. *See* 18 U.S.C. § 1591(a); *see also* (Dkt. 294) at 4. Besides being accurate statements of law supported by the facts of the case, the contested jury instructions also

appropriately were contained to the charges set forth in the Superseding Indictment. That is, the substitution of "or" for "and" did not allow for a conviction based on charges not contained in the Superseding Indictment. "[W]here a statute defines two or more ways in which an offense may be committed, all may be alleged in the conjunctive in one count." *United States v. Cox*, 536 F.3d 723, 726–27 (7th Cir. 2008) (internal citations omitted). Yet, even when it does as much, the jury need only find that the defendant's conduct violates the statute. *See United States v. Rice*, 520 F.3d 811, 817 (7th Cir. 2008) (explaining that because the firearm possession statute was in the disjunctive, the disjunctive jury instructions were proper); *see United States v. Kincaid*, 571 F.3d 648, 656 (7th Cir. 2009) (although the indictment uses the conjunctive, the statute of conviction (using the disjunctive) is correctly identified in the indictment, the elements of the statute are correctly set forth in the indictment, and the evidence adduced at trial supports the elements of the indicted offenses); *see also Griffin v. United States*, 502 U.S. 46 (1991) (explaining that "a general jury verdict under a *single* count charging the commission of an offence by two or more means" is sufficient) (emphasis in original). This is because "[t]he general rule is that when a jury returns a guilty verdict on an indictment charging several acts in the conjunctive . . . the verdict stands if the evidence is sufficient with respect to any one of the acts charged." *Turner v. United States*, 396 U.S. 398, 420 (1970). "This rule extends to a trial court's jury instructions in the disjunctive in the context of a conjunctively worded indictment." *United States v. Durman*, 30 F.3d 803, 810 (7th Cir. 1994).

This rule has been applied to situations analogous to the one presented here to reject claims of error based on the use of the conjunctive in charging documents. *Jones*, 418 F.3d 730 (indictment that charged that Jones "used, carried, brandished, and discharged a firearm" was not constructively amended by jury instructions that a finding of guilt would be appropriate if he

"knowingly used or carried a firearm," and that "'[u]se' may include brandishing, displaying, making reference to a firearm in the defendant's possession, or firing a firearm"); *see also United States v. Muelbl*, 739 F.2d 1175, 1179–81 (7th Cir. 1984) (for charged conspiracy to distribute, dispense, or possess with intent to distribute marijuana, cocaine, and methaqualone, the violation for one drug was a subset of the indictment for all of the drugs).

In other words, Nichols is incorrect in his argument that "by structuring the indictment the way that they did[,] that burden [to prove all of the elements set forth in the indictment] was taken on by the Government at the time of the Indictment." (Dkt. 294) at 4. The only case Nichols cites is *Stirone v. United States*, 361 U.S. 212 (1960), but that case presented a different issue. There, the indictment charged that the defendant violated the Hobbs Act, 18 U.S.C. § 1951, by causing "supplies and materials (sand) to move in interstate commerce." *Id*. at 213. During trial the judge allowed evidence that the defendant interfered with certain steel shipments as well. The court instructed the jury that the defendant's guilt could be predicated on either the sand or steel shipments. *Id*. at 214. The Supreme Court held that this was error because the indictment could not be reasonably read to charge interference with movements of steel and thus the defendant's right to be charged by the grand jury about the steel importation had been violated. *Id*. at 217–18. But the Court does not reach the same result here, where all possible means to support the conviction (recruiting, enticing, harboring, transporting, etc.) were included in the indicted counts. So instead of adding new charges or impermissibly broadening the indictment, as the *Jones* court held, "the jury instruction's use of the word 'or' was implicitly subsumed by the indictment's 'and,' and the jury instructions therefore did not impermissibly broaden the scope of the indictment." *Jones*, 418 F.3d at 730.

Relatedly, Nichols argues that the Court erred in preventing him from arguing in closing the above discussed "inconsistencies" between the Superseding Indictment and the instructions, meaning the use of the disjunctive "or" in the instructions. *See* (Dkt. 279) at (21). But for the reasons just discussed, the use of the conjunctive in the Superseding Indictment and the disjunctive in the Jury Instructions was not an "inconsistency," and Nichols's argument to the jury that referenced his disagreement to the Court's jury instruction rulings was improper for the jury to consider. Accordingly, the motion is denied on these grounds.[13]

### K.    Due Process Concerns

Nichols broadly argues that "[t]he indictment and proceedings were fundamentally and manifestly unfair; [Nichols] was denied his right to due process of law, to confront the evidence and witnesses against him, and to the assistance of counsel according to the Fifth and Sixth Amendments of the United States Constitution; due process and fundamental fairness required the setting aside of the guilty verdicts." *See* (Dkt. 279) at (19), (22). Where to begin with this far-reaching and indefinite catchall argument of error? Like many of his other arguments, this vague laundry list of constitutional violations is not developed or supported by any relevant caselaw and it is considered waived. *See Holm*, 326 F.3d at 877; *McLee*, 436 F.3d at 760. And in light of the lengthy analysis contained herein and the record of this matter as a whole, the Court finds no basis to support such an argument.

### L.    Cumulative or Overall Error

Finally, Nichols claims the cumulative effect of the errors denied him a fair trial. *See* (Dkt. 279) at (16), (17); *see also id.* at (23) (raising all error that may appear from the record).

---

[13] The government's response takes great effort to discuss the propriety of the various categories of objections the prosecutors made during Nichols's two-hour closing argument. *See* (Dkt. 312) at 93–99. Those arguments are well taken, but since Nichols has not presented any developed argument on this front, the Court will not re-analyze those objections for purposes of this motion.

Cumulative error exists where at least two errors committed during a trial denied defendant a fundamentally fair trial. *United States v. Adams*, 628 F.3d 407, 419 (7th Cir. 2010); *Alvarez v. Boyd*, 225 F.3d 820, 824 (7th Cir. 2000). To demonstrate cumulative error, Nichols must establish at least two errors occurred, and "considered together along with the entire record, the multiple errors so infected the jury's deliberation that they denied [him] a fundamentally fair trial." *United States v. Allen*, 269 F.3d 842, 847 (7th Cir. 2001). Here, no claimed errors warrant either reversal of the sex-trafficking or conspiracy convictions or a new trial. Overwhelming evidence proved that Nichols committed sex trafficking and conspired with others to do so. *See United States v. Groce*, 891 F.3d 260, 271 (7th Cir. 2018). He recruited vulnerable women in desperate circumstances into prostitution by making various promises of a better life. The jury heard extensive evidence about how he maintained control over these women and girls by assaults, threats, and manipulation. Particularly in light of the above analysis, there is no reason to think that any two or more potential errors combined to deprive him of a fundamentally fair trial. The record demonstrates his guilt "such that none of the asserted errors, either individually or cumulatively," could have affected the verdict. *Adams*, 628 F.3d at 420. All in all, the Court finds no basis on which to grant Nichols a new trial.

## CONCLUSION

For the reasons explained above, the Court denies Nichols's Motion for Judgment of Acquittal Notwithstanding the Verdict, or Alternatively, Motion for New Trial (Dkt. 279) and his Supplemental Motion (Dkt. 294).

_____

Hon. Virginia M. Kendall
United States District Judge

Date: January 31, 2019